## GONZALES v. WILLIAMS.

APPEAL FROM THE CIRCUIT COURT OF THE UNITED STATES FOR THE SOUTHERN DISTRICT OF NEW YORK.

No. 225. Argued December 4, 7, 1903.—Decided January 4, 1904.

The immigration act of March 3, 1891, 26 Stat. 1084, relates to foreigners as respects this country—to persons owing allegiance to a foreign govern. ment; citizens of Porto Rico are not "aliens," and upon arrival by water at the ports of our mainland are not "alien immigrants" within the intent and meaning of the act.

THE facts of this case, which involved the power of the Commissioner of Immigration at the Port of New York to detain a citizen of Porto Rico as an alien immigrant under the provisions of the act of March 3, 1891, 26 Stat. 1084, are stated in the opinion of the court.

Mr. Frederick R. Coudert, Jr., and Mr. Paul Fuller, with whom Mr. Charles E. LeBarbier was on the brief, for appellant:

The commissioner could have no jurisdiction unless the petitioner were an alien. Act of August 28, 1894, 28 Stat. 390. The Martonelli Case, 63 Fed. Rep. 437, was decided before the

statutes of 1894 were published.    The cession of Porto Rico definitely transferred the allegiance of the native inhabitants from Spain to the United States.    Arts. II, III, IX, Treaty of December 10, 1898.    This treaty made the territory domestic territory.    *De Lima* v. *Bidwell*, 182 U. S. 1.    For definitions of "alien" see Ency. of Law; Webster's International Dictionary; 2 Kent's Com. 50; Burrill's Law Dictionary, citing 1 Peters, 343; *Boyd* v. *Thayer*, 143 U. S. 162.    Allegiance determines nationality.    1 Pollock's Hist. of Eng. Law, 441, 443.    By the common law a change of sovereignty from a foreign domination makes the inhabitants, both *anti nati* and *post nati*, British subjects.    Chalmer's Colonial Opinions, 663; Lawrence's Wheaton, Appx. 894; *Campbell* v. *Hall*, 1 Cowper, 204; Westlake Int. Private Law, 203; *Doe* v. *Acklam*, 2 B. & C. 779; Stepney Election Petition, 1886, 17 Q. B. D. 54.    The United States did not, until this case arose, claim that Porto Ricans were aliens.    Brief of Attorney General in *Insular* cases, p. 172.    The question as to meaning of term citizen and what constitutes citizenship under the United States law must be examined in the light of the English law.    *United States* v. *Wong Kim Ark*, 169 U. S. 655.    See also *Minor* v. *Happersett*, 21 Wall. 162; *Ex parte Wilson*, 114 U. S. 417; *Boyd* v. *United States*, 116 U. S. 616; *Smith* v. *Alabama*, 124 U. S. 465; *Moore* v. *United States*, 91 U. S. 270; *Hennessy* v. *Richardson*, 189 U. S. 34.    Citizen and subject are identical terms.    Munroe Smith's Ency. Political Science and History under Nationality; Butler's Treaty Making Power, vol. 1, p. 16 *n.*

The change of allegiance, while it made the Porto Rican born before the cession a national or subject, did not necessarily make him a citizen.    There cannot, however, be an "American alien."    As to rights of citizens of United States and control of Congress thereover, see *Civil Rights Cases*, 109 U. S. 3; *Maxwell* v. *Dow*, 176 U. S. 581, 588; *Wong Wing* v. *United States*, 169 U. S. 228; Woodrow Wilson, The State, p. 498, § 917.

The theory of the treaty makers and the general policy of the Government is to confer the ordinary civil rights upon the

new inhabitants, while withholding from them all political privileges. Certain rights are accorded to all persons within the United States and they are not dependent upon citizenship or alienage. *Insular Cases*, 182 U. S., *Mankichi Case*, 190 U. S. 197. There are various gradations of subjection. Cogordon, La Nationalité, pp. 7, 8; Bluntschli's Theory of the State, Eng. Transl. 203. The *Dred Scott Case*, 19 How. 399, was the first to hold that subjection and citizenship were not necessarily identical in the United States. The status of the colored race, as settled by that decision, was changed by the Fourteenth Amendment. See dissenting opinion *United States v. Wong Kim Ark*, 169 U. S. 649. As to status of Indians, see *Elk* v. *Wilkins*, 112 U. S. 101. For illustrations of distinction between subjects and citizens, see Cogordon, La Nationalité; Glard, Nationalité Francaise, pp. 263, 380–408.

Mr. *Federico Degetau*, Resident Commissioner from Porto Rico, as *amicus curiæ* by leave of the court.

By the Protocol of August 12, 1898, Porto Rico was ceded by Spain to the United States; this cession was confirmed by Art. II of the Treaty of Paris. Congress, by subsequent legislation, enacted laws for that territory under the clause of the Constitution relating to the territory of the United States, Art. IV. sec. 3. The island, therefore, has ceased to be a province of Spain and has become "territory of the United States—although not an organized territory in the technical sense of the word." *De Lima* v. *Bidwell*, 182 U. S. 1. Under the military Government of the United States the inhabitants were released from their former political relations, General Miles' Proclamation—General Brooks' General Order No. 1, and took the oath to support the Constitution of the United States, renouncing forever all allegiance to any prince or potentate or foreign sovereignty and particularly that of the Government and sovereignty of Spain. This form of the transfer of sovereignty was confirmed by the act of April 12, 1900. Thus the inhabitants have acquired United States citizen-

ship, and have been incorporated with those who were already American citizens in the same *body politic* according to sec. 7 of said act. Some of those who were already American citizens prior to the annexation of Porto Rico have been elected members of the Porto Rican House of Delegates by the native citizens of Porto Rico, and in other cases as citizens of Porto Rico have cast their votes to elect natives of the Island as their representatives. The Resident Commissioner, a native citizen of Porto Rico, could not be entitled to represent, in a political capacity, the hundreds of citizens of the United States, born or naturalized in the mainland, who have given him their suffrages, if he were an alien. The taking as a member of the bar of this Honorable Court, the oath to maintain the Constitution of the United States, is incompatible with allegiance to any other power than that prescribed by, and defined in, the charter in which the sovereign people of the United States directly created this court as well as the other departments of our Government.

*Mr. Solicitor General Hoyt* for appellee:

The act of August 18, 1894, 28 Stat. 390, makes the decision of the appropriate immigration or customs officer, if adverse to the admission of an alien, final unless reversed on appeal to the Secretary of the Treasury. Even if appellant herein was ultimately entitled to a writ of *habeas corpus*, she was not in a position justly to obtain the writ until she had prosecuted an unavailing appeal to the Secretary of the Treasury, and thus pursued her remedy in the executive course to the uttermost.

The finality of the executive decision in cases relating to admitted aliens and those where the claim of citizenship is made has been repeatedly sustained by this court. *Nishimura Ekiu* v. *United States*, 142 U. S. 651; *Lem Moon Sing* v. *United States*, 158 U. S. 538; *Chin Bak Kan* v. *United States*, 186 U. S. 193; *Japanese Immigrant Case*, 189 U. S. 86. While there are decisions in the lower courts, arising under the Chinese exclu-

sion laws and other immigration laws, which appear to hold that where the initial question is whether the applicant for admission is or is not an alien, the executive jurisdiction is not completely conclusive, and does not oust the jurisdiction of the courts, on the whole, the tendency of this court and of the subordinate tribunals which have applied its decisions seems to be that the executive authority has the right and power to pass upon all questions presented, including the question whether a particular applicant is an alien or not; and the decision of that authority upon this question is final.

In this inquiry insistence on fixed and unchanging definitions of terms must be avoided. We are to weigh the inclusion and import of the word "alien" in the light of the spirit and meaning of the law. The holding of this court in *De Lima* v. *Bidwell*, 182 U. S. 1, with respect to the word "foreign" should not affect the question here on the word "alien." This issue, which affects persons and not things, immigration laws and not tariff laws, is essentially different.

Appellant is not a citizen, and is to be regarded as an alien within the meaning of the immigration laws.

It is conceded that the people of Porto Rico are connected with this Government by a certain tie distinguishing them from other ordinary foreigners, that they may be "nationals;" but this does not operate to confer citizenship. Must Congress have intended that all who were not aliens in the strict and unrelieved sense should escape the immigration laws, or that all who were not citizens should be subject to them? The solution of the controversy is dependent solely upon the proper construction of the law.

By the treaties ceding Florida, Louisiana, California and Alaska we agreed that the inhabitants of the ceded territories should eventually be admitted to citizenship. A review of the cases arising under those treaties shows that until the acquired territories were finally admitted to Statehood, the inhabitants were not truly citizens and were manifestly regarded, when the question was raised, as aliens. *United States*

v. *Laverty*, 3 Mart. 733; *American Insurance Co.* v. *Canter*, 1 Pet. 542; *Inglis* v. *Sailors' Snug Harbor*, 3 Pet. 99.

The authorities on international law show that nothing is predicated of the effect of cession beyond the general change of nationality and the general results of practice under treaties like our early ones.

The recent *Insular* cases anticipated this question in an illustrative way rather than as indicating settlement. We may, however, justly reach the conclusion that in the view of a majority of the court in *Downes* v. *Bidwell* there was, upon general principles, no incorporation of native inhabitants into our body politic; and in view of the express reservation by the treaty, recognized by subsequent legislation, it was necessary for Congress to determine what the exact status and rights of these inhabitants shall be. Nor do the dissents in the *Insular* cases suggest any conflict with the argument of the Government in the present case.

It is manifest that Congress, in enacting the immigration laws, found it necessary for our welfare to exclude the dangerous or burdensome classes of foreigners enumerated in those laws; and the court has sustained in the broadest terms the sovereign right of the nation to exclude aliens and the authority of Congress to enact the laws necessary for that purpose, and has noted the purpose and motive of the laws. The underlying reason and necessity of all such laws require that this bar against "native inhabitants" should be maintained until Congress has deliberately determined their status. An examination of the various laws enacted by Congress for Porto Rico and the Philippines, during the past three years, shows that any extension of the local rights and privileges requires a specific enactment; *e. g.*, army appropriation act of March 2, 1903, providing that citizens of Porto Rico shall be eligible for enlistment in the regular army; act of April 12, 1900, sec. 9, nationalizing Porto Rican vessels and admitting them to the coasting trade.

Opposing counsel regard the Government contention in this

case as involving a manifest incongruity.   But the attitude of the United States simply is that dangerous or feeble defectives among our island inhabitants are not to be admitted to this country as if they were citizens; and the supposed incongruity is disposed of by the statement that former aliens by birth and race, now under our sovereignty and protection in appurtenant domestic territory, are still aliens respecting proper immigrant exclusions, when the Spanish treaty and consequent laws preserved the *status quo ante,* and Congress has not affirmatively removed the ban.

Mr. Chief Justice Fuller delivered the opinion of the court.

This is an appeal by Isabella Gonzales from an order of the Circuit Court of the United States for the Southern District of New York, dismissing a writ of *habeas corpus* issued on her behalf, and remanding her to the custody of the United States Commissioner of Immigration at the Port of New York.   118 Fed. Rep. 941.

Isabella Gonzales, an unmarried woman, was born and resided in Porto Rico, and was an inhabitant thereof on April 11, 1899, the date of the proclamation of the Treaty of Paris; she arrived at the Port of New York from Porto Rico, August 24, 1902, when she was prevented from landing and detained by the Immigration Commissioner at that port as an "alien immigrant," in order that she might be returned to Porto Rico if it appeared that she was likely to become a public charge.

If she was not an alien immigrant within the intent and meaning of the act of Congress entitled "An act in amendment to the various acts relative to immigration and the importation of aliens under contract or agreement to perform labor," approved March 3, 1891, 26 Stat. 1084, c. 551, the commissioner had no power to detain or deport her, and the final order of the Circuit Court must be reversed.

The act referred to contains these provisions:

"That the following classes of aliens shall be excluded from admission into the United States, in accordance with the

existing acts regulating immigration, other than those con-
cerning Chinese laborers: All idiots, insane persons, paupers
or persons likely to become a public charge.   .   ,   .

"Sec. 8. That upon the arrival by water at any place within
the United States of any alien immigrants it shall be the duty
of the commanding officer and the agents of the steam or sailing
vessel by which they came to report the name, nationality,
last residence, and destination of every such alien, before any
of them are landed, to the proper inspection officers,   .   .   .
All decisions made by the inspection officers or their assistants
touching the right of any alien to land, when adverse to such
right, shall be final unless appeal be taken to the superintend-
ent of immigration, whose action shall be subject to review by
the Secretary of the Treasury.  It shall be the duty of the
aforesaid officers and agents of such vessel to adopt due pre-
cautions to prevent the landing of any alien immigrant at any
place or time other than that designated by the inspection
officers, and any such officer or agent or person in charge of
such vessel who shall either knowingly or negligently land or
permit to land any alien immigrant at any place or time other
than that designated by the inspection officers, shall be deemed
guilty of a misdemeanor.   .   .   ."

"Sec. 10. That all aliens who may unlawfully come to the
United States shall, if practicable, be immediately sent back
on the vessel by which they were brought in.   .   .   .

"Sec. 11. That any alien who shall come into the United
States in violation of law may be returned as by law pro-
vided,   .   .   ."

The treaty ceding Porto Rico to the United States was ratified
by the Senate, February 6, 1899; Congress passed an act to
carry out its obligations March 2, 1899; and the ratifications
were exchanged and the treaty proclaimed April 11, 1899, 30
Stat. 1754.  Then followed the act entitled "An act tempo-
rarily to provide revenues and a civil government for Porto
Rico, and for other purposes," approved April 12, 1900.  31
Stat. 77, c. 191.  The treaty provided:

"Article II.

"Spain cedes to the United States the island of Porto Rico and other islands now under Spanish sovereignty in the West Indies, and the island of Guam in the Marianas or Ladrones.

"Article III.

"Spain cedes to the United States the archipelago known as the Philippine Islands, and comprehending the islands lying within the following line. ·. . ."

"Article IX.

"Spanish subjects, natives of the Peninsula, residing in the territory over which Spain by the present treaty relinquishes or cedes her sovereignty, may remain in such territory or may remove therefrom, retaining in either event all their rights of property, including the right to sell or dispose of such property or of its proceeds; and they shall also have the right to carry on their industry, commerce and professions, being subject in respect thereof to such laws as are applicable to other foreigners. In case they remain in the territory they may preserve their allegiance to the Crown of Spain by making, before a court of record, within a year from the date of the exchange of ratifications of this treaty, a declaration of their decision to preserve such allegiance; in default of which declaration they shall be held to have renounced it and to have adopted the nationality of the territory in which they may reside.

"The civil rights and political status of the native inhabitants of the territories hereby ceded to the United States shall be determined by the Congress."

By the constitution of the Spanish monarchy, and the Spanish Civil Code, in force in Porto Rico when the treaty was proclaimed, persons born in Spanish territory were declared to be Spaniards, but Porto Ricans who were not natives of the Peninsula, remaining in Porto Rico, could not, according to the terms of the treaty, elect to retain their allegiance to Spain. By the cession their allegiance became due to the United

States, which was in possession and had, assumed the govern-ment, and they became entitled to its protection. The nationality of the island became American instead of Spanish, and by the treaty, Peninsulars, not deciding to preserve their allegiance to Spain, were to be "held to have renounced it and to have adopted the nationality of the territory in which they may reside."

Thereupon Congress passed the act of April 12, 1900. That act created a civil government for Porto Rico, with a Governor, Secretary, Attorney General, and other officers, appointed by the President, by and with the advice and consent of the Senate, who, together with five other persons, likewise so appointed and confirmed, were constituted an executive council, at least five of whom should be "native inhabitants of Porto Rico;" and local legislative powers were vested in a legislative assembly, consisting of the executive council and a house of delegates to be elected.

The Attorney General, the Treasurer, the Auditor, the Commissioner of the Interior, the Commissioner of Education were to make report through the Governor to the Attorney General of the United States, the Secretary of the Treasury of the United States, and so on, to be transmitted to Congress; and all laws enacted by the legislative assembly were to be reported to Congress, which reserved the power to annul the same.

Courts were provided for, and, among other things, Porto Rico was constituted a judicial district, with a district judge, attorney and marshal, to be appointed by the President for the term of four years. The district court was to be called the District Court of the United States for Porto Rico, and to possess, in addition to the ordinary jurisdiction of District Courts of the United States, jurisdiction of all cases cognizant in the Circuit Courts of the United States. And writs of error and appeals might be brought and taken from and to the Supreme Court of the United States.

Provision was also made for the election of a commissioner to the United States, to be paid a salary by the United States,

but no person was eligible to such election "who is not a *bona fide* citizen of Porto Rico, who is not thirty years of age, and who does not read and write the English language."

By section 9 regulations were to be made "for the nationalization of all vessels owned by the inhabitants of Porto Rico;" by section 14 the statutes of the United States were generally put in force in the island; by section 16 judicial process was to run in the name of the President of the United States.

By section 7 the inhabitants of Porto Rico, who were Spanish subjects on the day the treaty was proclaimed, including Spaniards of the Peninsula who had not elected to preserve their allegiance to the Spanish Crown, were to be deemed citizens of Porto Rico, and they and citizens of the United States residing in Porto Rico were constituted a body politic under the name of The People of Porto Rico.[1]

---

[1] Sections 7, 9, 14 and 16 were as follows:

"Sec. 7. That all inhabitants continuing to reside therein who were Spanish subjects on the eleventh day of April, eighteen hundred and ninety-nine, and then resided in Porto Rico, and their children born subsequent thereto, shall be deemed and held to be citizens of Porto Rico, and as such entitled to the protection of the United States, except such as shall have elected to preserve their allegiance to the Crown of Spain on or before the eleventh day of April, nineteen hundred, in accordance with the provisions of the treaty of peace between the United States and Spain entered into on the eleventh day of April, eighteen hundred and ninety-nine; and they, together with such citizens of the United States as may reside in Porto Rico, shall constitute a body politic under the name of The People of Porto Rico, with governmental powers as hereinafter conferred, and with power to sue and be sued as such."

"Sec. 9. That the Commissioner of Navigation shall make such regulations, subject to the approval of the Secretary of the Treasury, as he may deem expedient for the nationalization of all vessels owned by the inhabitants of Porto Rico on the eleventh day of April, eighteen hundred and ninety-nine, and which continued to be so owned up to the date of such nationalization, and for the admission of the same to all the benefits of the coasting trade of the United States; and the coasting trade between Porto Rico and the United States shall be regulated in accordance with the provisions of law applicable to such trade between any two great coasting districts of the United States."

"Sec. 14. That the statutory laws of the United States not locally inapplicable, except as hereinbefore or hereinafter otherwise provided, shall have

Gonzales was a native inhabitant of Porto Rico and a Spanish subject, though not of the Peninsula, when the cession transferred her allegiance to the United States, and she was a citizen of Porto Rico under the act. And there was nothing expressed in the act, nor reasonably to be implied therefrom, to indicate the intention of Congress that citizens of Porto Rico should be considered as aliens, and the right of free access denied to them.

Counsel for the Government contends that the test of Gonzales' rights was citizenship of the United States and not alienage. We do not think so, and, on the contrary, are of opinion that if Gonzales were not an alien within the act of 1891, the order below was erroneous.

Conceding to counsel that the general terms "alien," "citizen," "subject," are not absolutely inclusive, or completely comprehensive, and that, therefore, neither of the numerous definitions of the term "alien" is necessarily controlling, we, nevertheless, cannot concede, in view of the language of the treaty and of the act of April 12, 1900, that the word "alien," as used in the act of 1891, embraces the citizens of Porto Rico.

We are not required to discuss the power of Congress in the premises; or the contention of Gonzales' counsel that the cession of Porto Rico accomplished the naturalization of its people; or that of Commissioner Degetau, in his excellent argument as *amicus curiæ*, that a citizen of Porto Rico, under the act of 1900, is necessarily a citizen of the United States. The question is the narrow one whether Gonzales was an alien within the meaning of that term as used in the act of 1891.

---

the same force and effect in Porto Rico as in the United States, except the internal revenue laws, which, in view of the provisions of section three, shall not have force and effect in Porto Rico."

"Sec. 16. That all judicial process shall run in the name of 'United States of America, ss: the President of the United States,' and all criminal or penal prosecutions in the local courts shall be conducted in the name and by the authority of 'The People of Porto Rico;' and all officials authorized by this act shall before entering upon the duties of their respective offices take an oath to support the Constitution of the United States and the laws of Porto Rico."

The act excludes from admission into the United States, "in accordance with the existing acts regulating immigration other than those concerning Chinese laborers," certain classes of "aliens" and of "alien immigrants" arriving at any place within the United States, in respect of all of whom it is required that the commanding officer and agents of the vessel by which they come shall report the name, nationality, last residence and destination before any are landed.

The decisions of the inspection officers adverse to the right to land are made final unless an appeal is taken to the Superintendent of Immigration, whose action is subject to review by the Secretary of the Treasury; and all aliens who unlawfully come into the United States in violation of law shall be immediately, if practicable, sent back, or may be returned as by law provided.

We think it clear that the act relates to foreigners as respects this country, to persons owing allegiance to a foreign government, and citizens or subjects thereof; and that citizens of Porto Rico, whose permanent allegiance is due to the United States; who live in the peace of the dominion of the United States; the organic law of whose domicil was enacted by the United States, and is enforced through officials sworn to support the Constitution of the United States, are not "aliens," and upon their arrival by water at the ports of our mainland are not "alien immigrants," within the intent and meaning of the act of 1891.

Indeed, instead of the immigration laws operating externally and adversely to the citizens of Porto Rico, they were themselves put in force and effect there by section 14 of the act of April 12, 1900, as the Secretary of the Treasury was advised by the acting Attorney General, July 15, 1902, in respect of the act "to regulate immigration," approved August 3, 1882, 22 Stat. 214, c. 376; 24 Op. 86. The act provided for the collection of "a duty of fifty cents for each and every passenger not a citizen of the United States who shall come by steam or sail vessel from a foreign port to any port within the United

States. . . . The money thus collected shall be paid into
the United States Treasury, and shall constitute a fund to be
called the immigrant fund, and shall be used, under the di-
rection of the Secretary of the Treasury, to defray the expense
of regulating immigration under this act, . . ."

By section 2 inspection was provided for, "and if on such
examination there shall be found among such passengers any
convict, lunatic, idiot, or any person unable to take care of
himself or herself without becoming a public charge, they shall
report the same in writing to the collector of such port, and
such persons shall not be permitted to land."

The department held that the duty collected in Porto Rican
ports should be accounted for and credited to the "immigrant
fund," as is done with collections upon alien passengers arriv-
ing at ports in the United States.

In *Huus* v. *New York & Porto Rico Steamship Company*, 182
U. S. 392, 396, we held that by section 9 of the act of April 12,
1900, "it was evidently intended, not only to nationalize all
Porto Rican vessels as vessels of the United States, and to
admit them to the benefits of their coasting trade, but to place
Porto Rico substantially upon the coast of the United States,
and vessels engaged in trade between that island and the
continent, as engaged in the coasting trade."

Again, in respect of paragraph 703 of the tariff act of July 24,
1897, 30 Stat. 151, 203, c. 11, exempting "works of art, the
production of American artists residing temporarily abroad,"
the Department of Justice held that Mr. Molinas, a native of
Porto Rico, and an artist, temporarily living in Biarritz, France,
and there on April 11, 1899, became, under section 7 of the act
of April 12, 1900, a citizen of Porto Rico, and as such an
American artist entitled to the privileges of that paragraph.
24 Op. 40.

The Attorney General, in his communication to the Secretary
of the Treasury, among other things, said: "It will be observed
that paragraph 703 above quoted does not mention citizenship,
but uses the phrase 'American artists.' It is clearly not in-

conceivable for a man to be an American artist within the meaning of such a statute and yet not be a citizen of the United States." And after commenting on the effect of the temporary absence of Mr. Molinas at the time the treaty was proclaimed, the Attorney General concluded his opinion thus: "But even in supposing that a native Porto Rican like Mr. Molinas, temporarily absent at the date of the treaty, has been unintentionally omitted from section 7, he is undoubtedly one of those turned over to the United States by Article IX of the treaty to belong to our nationality. He is also clearly a Porto Rican; that is to say, a permanent inhabitant of that island, which was also turned over by Spain to the United States. As his country became a domestic country and ceased to be a foreign country within the meaning of the tariff act above referred to, and has now been fully organized as a country of the United States by the Foraker act, it seems to me that he has become an American, notwithstanding such supposed omission."

The Attorney General applied the ruling in *De Lima* v. *Bidwell*, 182 U. S. 1, that, "with the ratification of the treaty of peace between the United States and Spain, April 11, 1899, the island of Porto Rico ceased to be a 'foreign country' within the meaning of the tariff laws."

In that case we were all of opinion that the action was properly brought, because as the question was whether the goods were imported at all the case did not fall within the customs administrative act. *In re Fassett, Petitioner*, 142 U. S. 479.

And in the present case, as Gonzales did not come within the act of 1891, the commissioner had no jurisdiction to detain and deport her by deciding the mere question of law to the contrary; and she was not obliged to resort to the Superintendent or the Secretary.

Our conclusion is not affected by the provision in the Sundry Civil Act of August 18, 1894, 28 Stat. 372, 390, c. 301, in relation to the finality of the decisions of the appropriate immigration or custom officers, or the similar provision in the act "to regulate the immigration of aliens into the United States,"

approved March 3, 1903, 32 Stat. 1213, c. 1012. The latter act was approved after the Gonzales litigation was moved, but it is worthy of notice that the words "United States" as used in the title and throughout the act were required to be construed to mean "the United States and any waters, territory or other place now subject to the jurisdiction thereof." § 33. The definition indicates the view of Congress on the general subject.

Gonzales was not a passenger from a foreign port, and was a passenger "from territory or other place" subject to the jurisdiction of the United States.

In order to dispose of the case in hand, we do not find it necessary to review the Chinese exclusion acts and the decisions of this court thereunder.

*Final order reversed and cause remanded with a direction to discharge Gonzales.*