### CONNELL et al. v. VERMILYA–BROWN CO., Inc., et al.

No. 51, Docket 20717.

Circuit Court of Appeals, Second Circuit.

Nov. 28, 1947.

Soll L. Firstenberg, of New York City (Jacob Bromberg, of New York City, on the brief), for plaintiffs-appellants.

James Randall Creel, of New York City (Eidlitz, French, Fink & Markle, of New York City, on the brief), for defendants-appellees.

Before AUGUSTUS N. HAND, CLARK, and FRANK, Circuit Judges.

CLARK, Circuit Judge.

This appeal presents the interesting question whether or not the Fair Labor Standards Act, 29 U.S.C.A. § 201 et seq., applies to work done on an Outlying Defense Base in Bermuda obtained by the United States under a 99-year lease and executive agreement with the British Government on March 27, 1941. Defendants were engaged in a joint venture for the construction of such a base, now known as Fort Bell and Kindley Field, under a contract with the United States made February 4, 1941. Plaintiffs are eleven former employees of defendants seeking the benefits of the Act. Decision has gone against them below on summary judgment, and they now appeal.

Plaintiffs were hired in New York and were employed by defendants at different times during the period from September, 1941, to the middle of 1943 in connection with the construction of this Defense Base. All of the work for which they seek overtime compensation was performed in Bermuda. Seven of them were employed as patrolmen and acted as policemen in the leased areas; the other four were employed as fire patrolmen and acted as firemen in the same areas. The affidavit of plaintiff David Joseph Townsend, supported by the affidavit of plaintiff John Joseph Connell, describes the character of the work in which all the plaintiffs were engaged. Townsend avers that a substantial part of their duties was to protect materials unloaded from ships docked in St. George and Hamilton, Bermuda. Included in such materials were crates that were never opened, but were reshipped to other places. He did not know their ultimate destination. Because of wartime conditions he was unaware of the places to which the materials were shipped.

The obligations defined by the Act are required of every employer for the benefit of each of his employees "who is engaged in commerce or in the production of goods for commerce," 29 U.S.C.A. §§ 206, 207, with certain exemptions not here pertinent stated in § 213. "Commerce" is defined to mean "trade, commerce, transportation, transmission, or communication among the several States or from any State to any place outside thereof"; while " 'State' means any State of the United States or the District of Columbia or any Territory or possession of the United States." § 203(b) and (c). The district court ruled that none of the leased areas of Bermuda where the construction work of the defendants was being performed was a "Territory or possession of the United States" within the meaning of the Act. Our question is therefore as to the correctness of this ruling and specifically whether or not the leased area is a "possession" within the statutory meaning.

█ Initially we must ascertain the nature and extent of the transfer of interest made by the Government of the United Kingdom of Great Britain and Northern Ireland to this country in the Agreement and Lease, as set forth in 55 Stat. Pt. 2, 1560–1594. The Lease itself refers to notes previously exchanged for the grant "of the lease of naval and air bases and facilities connected therewith, in certain localities," and then provides for the demise to the United States of America of "all that property described in the Schedule hereto and delineated on the plan[s] annexed hereto" for a term of 99 years, with the "rights, powers and authority and on the terms and conditions" stated in the contemporaneous Agreement, which "shall be regarded as incorporated in and made part of this lease." 55 Stat. Pt. 2, 1577.

The Agreement is therefore the important document for our purposes. This provides initially as a "General Description of Rights": "The United States shall have all the rights, power and authority within the Leased Areas which are necessary for the establishment, use, operation and defence thereof, or appropriate for their control, and all the rights, power and authority within the limits of territorial waters and air spaces adjacent to, or in the vicinity of, the Leased Areas, which are necessary to provide access to and defence of the Leased Areas, or appropriate for control thereof." Art. I(1), 55 Stat. Pt. 2, 1560. It then continues with the enumeration of certain specific "rights, power and authority" included "inter alia," such as "(a) to construct (including dredging and filling), maintain, operate, use, occupy and control the said Bases," and "(d) to regulate and control within the Leased Areas all communications within, to and from the areas leased." 55 Stat. Pt. 2, 1561.

Other provisions also serve to show the nature of the grant. Thus the United States is given the "absolute right" to assume and exercise jurisdiction of all offenses within a leased area, by a British subject "apprehended therein," and by any other person, without restriction, with provision for surrender of offenders to the appropriate authority of the Territory if the United States so elects, Art. IV(1, 2), and for surrender of offenders to the United States authorities where they are within the Territory, but outside the leased areas, Art. VIII. The immigration laws of the territory adjacent to the bases do not apply to the leased areas, Art. XIII. United States postal facilities are to be established in the leased areas, Art. XVI. No person in the leased areas serving or employed there can be subject to income tax or poll tax of the territory adjacent to the bases, Art. XVII. The leased areas are to revert to the "Lessor" only when abandoned by the United States with "notice" of such abandonment, Art. XXI. And Art. XXIV, significantly entitled "Possession," provides: "On the signing of this Agreement, leases of the Leased Areas, substantially in the forms respectively set out in Annex II hereto, shall be forthwith executed, and all rights, power, authority and control under such leases and under this Agreement (including transfer of possession where it shall not previously have been transferred) shall thereupon become effective immediately, and pending execution of such Leases they may be exercised ad interim and possession of the Leased Areas shall be immediately given so far as the location thereof is then ascertained. Where the

precise location of a portion of any Leased Area is not ascertainable until more detailed descriptions are available, possession of such portion shall be given as rapidly as possible." 55 Stat. Pt. 2, 1569.

The Agreement does not specifically declare the leased areas to be part of the territory of the United States. It does contain, however, the following interesting negative provision: "It is understood that a Leased Area is not a part of the territory of the United States for the purpose of coastwise shipping laws so as to exclude British vessels from trade between the United States and the Leased Areas." Art. XI(4), 55 Stat. Pt. 2, 1565.

The cumulative effect of these various provisions compels the conclusion that the areas are subject to fully as complete control by the United States as obtains in other areas long known as "possessions" of the United States. Thus, Title 48 of the United States Code Annotated entitled, "Territories and Insular Possessions," includes laws relating to such diverse areas as the Philippine Islands, § 1001 et seq. (compare usage in the Supreme Court, Hooven & A. Co. v. Evatt, 324 U.S. 652, 672–674, 678, 680, 65 S.Ct. 870, 89 L.Ed. 1252); the islands upon which guano is discovered, §§ 1411–1419; and Swains Island, Tutuila, Manua, and other Samoan islands, and Guam, §§ 1431, 1431a, 1432, 1433, with all the diverse governments and degrees of sovereignty involved in these instances. Except for the Philippines, now made independent, 48 U.S.C.A. § 1231 et seq., those possessions seem rather clearly included within the coverage of the Act; indeed, the General Counsel of the Division specifically includes Guam, Guano Islands, and Samoa along with Alaska, Hawaii, Puerto Rico, the Canal Zone, and the Virgin Islands as "territories and posses-sions" subject to the Act. Release No. 73, Office of the General Counsel, Wages and Hours Division.[1] The Act would seem broadly enough phrased, in its purpose "to extend federal control in this field throughout the farthest reaches of the channels of interstate commerce," Walling v. Jacksonville Paper Co., 317 U.S. 564, 567, 63 S.Ct. 332, 335, 87 L.Ed. 460, to cover American workmen at Bermuda bases as fully as natives working in Samoa or Guam.[2] Indeed, the coverage is, if anything, still broader; the statutory reference is to "possession" uncapitalized (unlike the reference to "Territory"), not even to "Insular Possessions," and may indeed be intended to be as broadly inclusive as the simple definition of Webster's Dictionary: "The thing possessed; that which anyone occupies, owns, or controls; in pl., property in the aggregate; wealth; dominion; as, foreign possessions." We need not so decide at this time; but we feel compelled to conclude that the intended coverage of the Act is sufficiently broad to include areas such as those here in question.

Defendants urge, and the district court agreed, that the question whether the areas are possessions is a political one, either already settled or to be settled only by executive or legislative determination. Undoubtedly courts should avoid the determination of political issues, but it is difficult to see how this is such an issue. Before us is a matter of interpretation of an Act in issue between two groups of private parties. Obviously this arises in consequence of political acts, and those conceivably might have been of such precise form or exact agreement with a foreign state as to settle the question. But here they were not, and we must determine this private controversy, even if it arises as to areas affected by an agreement between nations.

[1] Defendants stress the omission of these leased areas from the General Counsel's enumeration. But there is no indication of an intent to exclude all else. An answer to an inquiry, made by the Deputy Administrator, properly stresses the conflicting legal decisions and expresses regret that he cannot give a more definite answer as to those areas. Prentice-Hall Wage and Hour Serv. par. 11,-809, 1946.

[2] Thus it was found necessary to extend the more limited coverage of the Longshoremen's and Harbor Workers' Compensation Act, 33 U.S.C.A. §§ 902(8, 9), 903, as provided in Defense Base Compensation Act of Aug. 16, 1941, as amended Dec. 2, 1942, 42 U.S.C.A. §§ 1651–1654; Republic Aviation Corporation v. Lowe, 2 Cir., 164 F.2d 18.

Ex parte Cooper, 143 U.S. 472, with full discussion at pages 499–503, 12 S Ct. 453, 36 L.Ed. 232. As a matter of fact the courts have not hesitated to determine the status of acquired territory for the purposes of a particular case and with reference to particular acts of Congress, including those passed prior to such acquisition. De Lima ₮. Bidwell, 182 U.S. 1, 21 S.Ct. 743, 45 L. Ed. 1041; Huus v. New York & P. R. S. S. Co., 182 U.S. 392, 21 S.Ct. 827, 45 L.Ed. 1146; Fourteen Diamond Rings v. United States, 183 U.S. 176, 22 S.Ct. 59, 46 L.Ed. 138; Gonzales v. Williams, 192 U.S. 1, 24 S.Ct. 177, 48 L.Ed. 317; Faber v. United States, 221 U.S. 649, 31 S.Ct. 659, 55 L.Ed. 897; Hooven & A. Co. v. Evatt, supra; La Ninfa, 9 Cir., 75 F. 513, 21 C.C.A. 434.[3]

If, however, the other departments of government have shown a clear view as to the proper answer to this problem, we should certainly take at least careful note of that fact. But, notwithstanding defendants' contentions, it seems clear that they have not. Thus defendants quote from the opinion of the Attorney General upholding the validity of the Executive Agreement here, wherein he states, "The privilege of maintaining such bases is subject only to limitations necessary to reconcile United States' use with the sovereignty retained by Great Britain."[4] But this is aimed at a different problem; it can be easily claimed as authority favoring the plaintiffs' position, rather than the reverse. They also cite a letter from the State Department, by its Acting Legal Adviser, to the effect that "this Government has not made any claim that the bases in Bermuda are territories or possessions of the United States and there would therefore appear to be no reason for any ruling or opinion on the matter."[5] Both the facts that this statement was made in quite a different setting and that there was "no reason for any ruling or opinion on the matter" clearly negate any suggestion that the Executive Departments have determined the issue.[6]

---

[3] Thus, these cases also demonstrate the unsoundness of defendants' further contention that this Act may not apply to a newly acquired possession until Congress has specifically made it applicable. Cases cited by them concern only the guaranties of the Constitution, such as trial by jury, which have been held not to extend to the insular possessions except as Congress has made them applicable. Balzac v. People of Porto Rico, 258 U.S. 298, 42 S.Ct. 343, 66 L.Ed. 627; Dorr v. United States, 195 U.S. 138, 24 S.Ct. 808, 49 L.Ed. 128, 1 Ann.Cas. 697; Hooven & A. Co. v. Evatt, 324 U.S. 652, 674, 65 S.Ct. 870, 89 L.Ed. 1252.

[4] 39 Ops. Att'y Gen. 484, 485, re "Acquisition of Naval and Air Bases in Exchange for Over-Age Destroyers."

[5] The letter addressed to defendants' attorneys is as follows:
"Sirs:
"The department has received your letter of May 1, 1946 with further reference to the status of bases leased from Great Britain.
"The bases in Bermuda were obtained under the same circumstances as the other bases obtained from Great Britain as will be apparent from the documents contained in Executive Agreement Series 235 to which you were referred in a previous communication. As you were advised by the Department's letter of April 30, 1946 this Government has not made any claim that the bases in Bermuda are territories or possessions of the United States and there would therefore appear to be no reason for any ruling or opinion on the matter.
"Very truly yours,
"For the Acting Secretary of State:
"R. W. Flournoy
"Acting Legal Adviser"
The earlier letter of April 30, 1946, merely answered the specific question whether or not civil courts of the United States had been established in the area. Thus the letter in context shows that the problem considered by the State Department concerned not the present issue, but rather the general status of the leased areas with particular respect to the establishment of civil courts.

[6] Other references seem even less pointed. They include a reply to counsel from the Acting Director, Division of Territories and Island Possessions, of the Department of the Interior, that no executive order or other directive had given his division jurisdiction over these military and naval bases; also citation of an Act of March 22, 1943, 34 U.S.C.A. § 1201, extending the jurisdiction of naval courts martial to civilian employees and others at naval bases and air bases within areas leased by the United States "without the territorial jurisdiction thereof." Cf. Art. IV of the Executive Agreement, discussed above; also notes 1 and 2, supra.

We have discovered only two cases squarely dealing with this problem, and each has held the Act applicable. Eckert v. Elmhurst Contracting Co., 185 Misc. 108, 56 N.Y.S.2d 98, affirmed 186 Misc. 100, 61 N.Y.S.2d 730; Crowe v. Elmhurst Contracting Co., —— Misc. ——, 74 N.Y.S.2d 445. Watt v. McWilliam Dredging Co., City Ct. N.Y., N.Y.L.J. Nov. 1, 1944, p. 1130, considered the applicability of the Act to a storekeeper on construction work in Greenland in an area leased to this government by Denmark. The court there held for the defendant on the separate ground that plaintiff storekeeper was not engaged in commerce or in the production of goods for commerce under the Act. This case did not decide whether or not the area was a "possession" within the meaning of the Act. In Filardo v. Foley Bros., 181 Misc. 136, 45 N.Y.S.2d 262, the Act was held not to apply to a defense base in Iran; in Campbell v. White Const. Co., Civ. No. 28-230, D.C.S.D.N.Y.1944, unreported, a similar ruling was made as to a base in Brazil. So, too, in Bernhard v. Metcalfe Const. Co., D.C.Neb., 64 F.Supp. 953, and Burns v. Metcalfe Const. Co., D. C.W.D.Mo., 69 F.Supp. 381, the Act was held not to apply to construction jobs in Canada. The facts in these cases indicate distinctions from those present here. There the problem was whether or not the Act would apply to persons working in foreign countries. Here there is a long-term lease entered into with our government which gives it sweeping powers in the area. Without such arrangements for control these other plaintiffs were shown only to be working in foreign countries to which the coverage of the Act has not been extended.

The affidavit of plaintiff Townsend, cited above, avers that a substantial part of the plaintiffs' duties was to protect goods and materials loaded and unloaded from ships docked at St. George and Hamilton, Bermuda; and included in such materials were thousands of crates that were never opened, but were reshipped to other places. In the light of this assertion we cannot say they were not engaged in commerce. See Engebretsen v. E. J. Albrecht Co., 7 Cir., 150 F.2d 602, and cases therein cited. Another contention by defendants, that two of the plaintiffs were exempt as executives, was not pressed on this appeal.

Reversed and remanded for further proceedings consistent with this opinion.