Vicente Cevallos **FRAUSTO,**
Plaintiff,

v.

Herbert **BROWNELL,** Attorney General
of the United States, Defendant.

No. 18245.

United States District Court
S. D. California, Central Division.

April 16, 1956.

David C. Marcus, Los Angeles, Cal., for plaintiff.

Laughlin E. Waters, U. S. Atty., Max F. Deutz, Asst. U. S. Atty., Chief of Civil Division, Arline Martin, Asst. U. S. Atty., Los Angeles, Cal., for defendant.

WESTOVER, District Judge.

Plaintiff herein was born April 5, 1926 at Fillmore, Ventura County, California, and by reason of such birth became a native-born citizen of the United States of America. When he was six years of age his parents took him to a small, isolated, rural community at Hacienda Mague, adjoining the Rancho Francisco I. Madero, State of Zacatecas, Republic of Mexico. He grew up in that rural community and engaged in agricultural work, the proceeds of which were used to support the entire family.

Plaintiff spent only one year in school in Mexico and can neither read, write nor understand the English language. He has only a very rudimentary education in the Spanish language.

Plaintiff identifies the person who seemed to be the head of public affairs in the rural community where he resided as the "comisario." The comisario was apparently entrusted with the responsibility of "getting out the vote" in Mexican elections in that area. In July, 1946, when petitioner was twenty years of age, he was approached by the comisario who stated in effect that petitioner was old enough to vote and would have to vote in the approaching national election. Plaintiff told the comisario that he was a citizen of the United States and, therefore, could not vote in a Mexican election. According to petitioner, he was informed by the comisario that if he failed to vote, he would be put in jail.

On election day the comisario gathered up the voting population of the small community, including plaintiff herein, and transported them some distance to the voting place. Again, according to petitioner, he protested voting, stating that he was an American citizen; and again the comisario threatened to put plaintiff in jail if he did not vote. When petitioner was taken into the room to vote he stated to the voting officials that he was an American citizen and therefore could not vote, but again he was threatened with imprisonment for failure to vote. Forced by this threat of prison, petitioner cast his vote in a Mexican National Election for president.

Some time thereafter petitioner made his way to El Paso, Texas, where he asked to be admitted into the United States, but because he did not have evidence of his citizenship he was told to return when he had such evidence. In August, 1952 petitioner appeared before the Immigration authorities at Calexico, California, presented the birth certificate and asked to be admitted into the United States as an American citizen. Instead of admitting petitioner, upon presentation of his birth certificate, the Immigration authorities questioned him, and when it was ascertained that he had voted in Mexico, petitioner was taken before a special board of inquiry, and the special board of inquiry determined through questioning that he had voted in Mexico. When asked whether or not the voting had been voluntary, petitioner replied in the affirmative. Whereupon the special board made findings of fact and conclusions of law, finding that petitioner was born in Fillmore, California, on April 5, 1926; that he had been taken by his parents to Mexico about 1932; that he had remained in Mexico since that time; that he voted of his own free will in the presidential election of June 7, 1946 in Mexico and that because of such voting he had lost his American citizenship.

An appeal was taken from the decision of the special board of inquiry but was dismissed. No reason appears in the record as to why or under what circumstances the appeal was dismissed.

In February, 1953, petitioner went to the United States Consul at Mexicali, B. C., Mexico, requesting that he be admitted to the United States as a citizen, and on February 10, 1953, the American Consul issued a certificate of loss of nationality of the United States on the ground that petitioner had expatriated himself by voting in Mexico at a national election. According to the record, petitioner stated to the Consul that he was told that if he did not vote, he would be taken to jail.

After his appearance before the Consul at Mexicali petitioner, using credentials which he had obtained from some other person, crossed the border and relocated within the Southern District of California. On March 26, 1955, he filed his petition for declaratory judgment and judicial determination of United States citizenship.

Jurisdiction was invoked pursuant to Section 360(a) of Public Law 414, § 1503, Title 8, U.S.C.A., and under the provisions of § 2201, Title 28, United States Code, and Article III and the Fourteenth Amendment of the Constitution of the United States. Upon service of summons and petition upon defendant, the government questioned the jurisdiction of this court and filed its Motion to Dismiss.

The first question confronting the court in these proceedings was that of jurisdiction. The petition on file indicates jurisdiction was invoked on three grounds:

1. Pursuant to Section 360(a) of Public Law 414,

2. Under provisions of Title 28, § 2201, United States Code (Declaratory Judgment procedure), and

3. Under the 14th Amendment of the Constitution.

The Motion to Dismiss was denied by the Court, and the matter was regularly set for hearing.

■ At the hearing the government contended, among other things, that petitioner could not maintain this action because he is illegally within this country. The rule is stated in Nevarez v. Brownell, 5 Cir., 218 F.2d 575, at page 577, in which the Court said:

"* * * He came into the country in violation of the orders excluding him and cannot now take advantage of his own illegal action to give the court jurisdiction * * *."

■ Whether petitioner was illegally in this country at the time the action was filed depends entirely upon the fact of citizenship. If he was not a citizen, he was illegally within the United States and could not use the courts to establish his rights. However, if he was a citizen of the United States, he was entitled to have recourse to its courts. The Immigration authorities have no right to keep out of this country one who is a citizen.

■ The government has contended that a proceeding such as this is impossible under the Immigration and Nationality Act of 1952. The Act went into effect in December, 1952, and since that time very few of the Circuit Courts have determined the rights of litigants affected by the saving clause of the Act. The right of petitioner to proceed under Section 360(a) of Public Law 414 depends entirely upon the saving clause of the 1952 Act, which reads as follows:

"§ 405. (a) Nothing contained in this Act, unless otherwise specifically provided therein, shall be construed to affect * * * any status, condition, right in process of acquisition, act, thing, liability, obligation, or matter, civil or criminal, done or existing, at the time this Act shall take effect; but as to all such prosecutions, suits, actions, proceedings, statutes, conditions, right, acts, things, liabilities, obligations, or matters the statutes or parts of statutes repealed by this Act are, unless otherwise specifically provided therein, hereby contin-

ued in force and effect. * * * " 66 Stat. 280, 8 U.S.C. p. 734, 8 U. S.C.A. § 1101 note.

The government has contended, and the Court is in agreement, that the proceedings in August, 1952, before the Department of Immigration and Naturalization and before the special board of inquiry was a proceeding within the meaning of Paragraph 405(a) of the Act of 1952.

In Wong Kay Suey v. Brownell, D.C.Cir., 227 F.2d 41, (decided October 13, 1955) this identical problem was presented to the Court, and the Court says, at page 43:

"We take § 360(a) to mean that no right to have the issue of citizenship determined in a suit for a declaratory judgment shall arise in the future, if the issue of citizenship arose in connection with exclusion proceedings. In view of the savings clause, we do not take § 360(a) to mean that an existing right to sue for a declaratory judgment shall be cut off."

To put the matter in another way—it is our opinion that the right to have the issue of citizenship determined in a suit for declaratory relief is not prohibited by the Immigration and Nationality Act of 1952, if the issue of citizenship arose in connection with exclusion proceedings commenced before the effective date of the Act.

The Act in question did not go into effect until December 26, 1952. These hearings were held in August, 1952. They were initiated and concluded prior to the date when the Act took effect. We hold that petitioner comes within the saving clause and can maintain this action for declaratory judgment under the Immigration and Naturalization Act of 1952 as his proceedings were commenced before the expiration of the prior Act.

Jurisdiction is claimed under the provisions of Title 28, § 2201, U.S.C.A. Section 2201 reads as follows:

"In a case of actual controversy * * *, upon the filing of an appropriate pleading [the court] may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought. * * * "

It appears that petitioner is entitled to a judicial review under the provisions of Section 10 of the Administrative Procedure Act, 5 U.S.C.A. § 1009, which provides that:

"Any person suffering legal wrong because of any agency action, or adversely affected or aggrieved by such action within the meaning of any relevant statute, shall be entitled to judicial review thereof."

And § 12 of the Act, 5 U.S.C.A. § 1011, provides:

"No subsequent legislation shall be held to supersede or modify the provisions of this Act except to the extent that such legislation shall do so expressly."

In Shaughnessy v. Pedreiro, 349 U.S. 48, 75 S.Ct. 591, 594, 99 L.Ed. 868, the Supreme Court found that there was in the 1952 Immigration and Nationality Act no language which " 'expressly' supersedes or modifies" the expanded right of review granted by § 10 of the Administrative Procedure Act, and in that case the Supreme Court held that there was a right of judicial review in deportation orders other than by habeas corpus.

The government in the case at bar has attempted to make a distinction between deportation and exclusion. However, the end result is the same—that is, to keep the alleged violator out of the United States; and when we speak of the substantial rights of parties, we can see no great difference between the government's attempt to exclude a citizen or its effort to deport an alien.

The Supreme Court, in United States ex rel. Bilokumsky v. Tod, 263 U.S. 149, at page 152, 44 S.Ct. 54, at page 55, 68 L.Ed. 221 says:

"If, in the deportation proceedings, Bilokumsky had claimed that he was a citizen and had supported

the claim by substantial evidence, he would have been entitled to have his status finally determined by a judicial, as distinguished from an executive, tribunal. * * *"

In Kessler v. Strecker, 307 U.S. 22, at pages 34 and 35, 59 S.Ct. 694, at page 700, 83 L.Ed. 1082, the Court says:

"* * * Only in the event an alleged alien asserts his United States citizenship in the hearing before the Department, and supports his claim by substantial evidence, is he entitled to a trial de novo of that issue in the district court. The status of the relator must be judicially determined, because jurisdiction in the executive to order deportation exists only if the person arrested is an alien; * * *."

◼ This Court feels that in the case at bar there must be a judicial determination of this question, because jurisdiction of the executive order to keep the petitioner from entering the United States exists only if he is an alien.

Subsequent to the Kessler case, supra, Judge Murphy of the District Court of Northern California, in Ex parte Gros, 123 F.Supp. 718, decided a question somewhat similar to the case at bar, holding that the petitioner was entitled to a judicial hearing. Judge Murphy said the question of expatriation is included in the question of citizenship.

In the Ninth Circuit case of Espino v. Wixon, 136 F.2d 96, the appellant claimed and testified that he was a native born citizen of the United States. He had made several statements to the authorities that he was a native of Mexico, but at the judicial hearing he testified that the statements made about being born in Mexico were false and that he made them only to obtain a re-entry. Judge Stephens, in writing the opinion, stated at page 97:

"That a judicial trial of the issue of citizenship is necessary seems clear from the facts and the authorities. * * * 'Jurisdiction in the executive to order deportation exists only if the person arrested is an alien. * * *'

* * * * * *

"In our opinion the petitioner's claim of United States citizenship together with his testimony upon that issue before the Immigration Authorities requires a judicial hearing. * * *"

In United States v. Ju Toy, 198 U.S. 253, at page 272, 25 S.Ct. 644, at page 650, 49 L.Ed. 1040, Mr. Justice Brewer of the Supreme Court in a dissenting opinion quotes the Court of Appeals of the Ninth Circuit in the case of Gee Fook Sing v. United States, 49 F. 146, 148, as follows:

"'That any person alleging himself to be a citizen of the United States, and desiring to return to his country from a foreign land, and that he is prevented from doing so without due process of law, and who, on that ground, applies to any United States court for a writ of habeas corpus, is entitled to have a hearing and a judicial determination of the facts so alleged; and that no act of Congress can be understood or construed as a bar to such hearing and *judicial determination.*'" [Emphasis supplied.]

And in Gonzales v. Williams, 192 U.S. 1, at page 7, 24 S.Ct. 177, 48 L.Ed. 317, the Supreme Court said:

"Isabella Gonzales, an unmarried woman, was born and resided in Porto Rico, and was an inhabitant thereof on April 11, 1899, the date of the proclamation of the Treaty of Paris (30 Stat. at L. 1754). She arrived at the Port of New York from Porto Rico August 24, 1902, when she was prevented from landing, and detained by the Immigration Commissioner at that port as an 'alien immigrant,' in order that she might be returned to Porto Rico if it appeared that she was likely to become a public charge.

"If she was not an alien immigrant within the intent and meaning

of the act of Congress * * *, the commissioner had no power to detain or deport her, and the final order of the circuit court must be reversed."

The appeal in United States ex rel. Lapides v. Watkins, 2 Cir., 165 F.2d 1017, presented to the court questions as to correct procedure for determining the admissibility of one who seeks to enter the United States, not as an alien but as an American citizen. In that case Watkins was detained by the Immigration authorities and given a hearing before the board of special inquiry. The board of special inquiry excluded him, and the determination of the board was upheld by the Commissioner and the Board of Immigration Appeals. The Court said, at page 1018:

"* * * If he is a citizen, he was unlawfully detained, for neither the Director of Immigration and Naturalization nor a Board of Special Inquiry has any power to exclude a citizen * * *."

In Carmichael v. Delaney, 170 F.2d 239, the Circuit Court for the Ninth Circuit passed upon a case similar to that at bar. In the Carmichael case the court found that the plaintiff was born in Brooklyn; that his mother died a week after his birth and his father took plaintiff to Ireland where he grew up. Plaintiff returned to the United States and lived for many years, then took a trip outside the country. When he wished to return to the United States he was held by the Immigration authorities upon the claim that he was an alien. Exclusion proceedings before the board of special inquiry were instituted, and after the hearing plaintiff was excluded from the United States. The Circuit Court, in passing upon the action of the lower court in upholding the board of special inquiry, said at page 241:

"The judge, while treating the proceeding before the board of special inquiry as properly an exclusion proceeding, accorded to the petitioner a judicial trial of his claim of

American nativity. The director contends that this was error. He says that the administrative finding that appellee is not a citizen is final and that no ground exists for judicial intervention. Ordinarily, in an exclusion proceeding we understand the law to be as the director contends it to be, [citing cases] and if this were all there is to be said of the case we would be obliged to reverse the trial court inasmuch as the administrative finding of alienage was substantially supported by the evidence before the board.

"But this is by no means all there is to be said of the matter. From the record on appeal two questions emerge, * * * and (2), assuming an entry, whether the principle of administrative finality ordinarily thought applicable in exclusion cases governs here. * * *

* * * * * *

"We conclude that the trial court was right in granting appellee a judicial trial of his claim. * * *"

The real question before this Court is whether petitioner herein is an American citizen. However, there is a corollary question that should be commented upon—Did petitioner receive a fair hearing when he was ordered expatriated? It is fundamental in American jurisprudence that every person is entitled to a fair trial by an impartial tribunal. United States ex rel. Pazos v. Redfern, C.C., 180 F. 500.

The Circuit Court of Appeals for the First Circuit, in O'Connell ex rel. Kwong Han Foo v. Ward, 126 F.2d 615, at page 618, states as follows:

"* * *, the District Court is without jurisdiction to consider the merits of cases like the present until it has been established to that court's satisfaction that the applicant had not been given 'a hearing properly so called' by the Board."

Did the petitioner in the case at bar receive a fair hearing before the board of special inquiry?

According to the record presented by the government at the trial before this Court, the board of special inquiry was composed of F. K. Boynton, R. V. Alves and M. M. Greene. It developed from the testimony given before this Court that M. M. Greene, Secretary and Member of the Board, was a grade two or three employee, age about twenty-one years, hired as secretary to F. K. Boynton, Chairman of the Board; that she had no experience whatever concerning the law of expatriation, other than that which she picked up while working in Immigration and Naturalization Service as a clerk-typist. Not only did she act as secretary of the board of special inquiry, with the duty of keeping the board's minutes, but she also was stenographer-typist for the board. According to the testimony at the trial, each question was propounded to petitioner, being first stated in English by the Chairman so that the Secretary of the Board could type it, then translated to petitioner in Spanish by Chairman Boynton, acting in the capacity of interpreter; then, after petitioner's reply in Spanish Chairman Boynton translated and interpreted the answer, so that his secretary, M. M. Greene—member and "Secretary of the Board"—could type the answer in English.

It does not appear that Board Member Greene either speaks, writes, reads or understands the Spanish language. It also appears that F. K. Boynton, Chairman of the Board, acted in the capacity of board chairman, interrogator, translator and interpreter. At the trial petitioner testified that he did not know "what they put down on the paper."

F. K. Boynton acted as chairman, interrogator, translator and interpreter; his clerk-typist acted as member and secretary of the board and "stenographer", taking down on the typewriter the questions and answers dictated by Mr. Boynton. Petitioner was an ignorant, uneducated Mexican, appearing before the board of special inquiry without counsel and unaccompanied by any representative. Questions were put to him relative to whether he had voted in Mexico and whether such voting had been voluntary.

This Court has tried many cases in which the services of interpreters have been employed and is fully cognizant of the fact that sometimes it is very difficult to interpret and translate questions and answers from English to a foreign language and from the foreign language into English and still retain the niceties of expression, nuances, and intent and meaning of the statements. Even interpreters themselves disagree as to what meaning is intended from the statement made by witnesses. Recently it was this Court's experience that two interpreters at the same trial failed to agree on what a witness said. It is difficult under any circumstances to obtain testimony through interpreters, as language suffers by translation and often the true expression and meaning is lost.

The third member of this board of special inquiry was a Mr. R. V. Alves. Mr. Boynton testified that this member was not at any time present during the hearing on petitioner's claim of citizenship. Mr. Alves had other work at Immigration headquarters to claim his attention. According to Mr. Boynton, Mr. Alves during this entire hearing "was busy downstairs." As far as the evidence discloses Mr. Alves did not see the applicant, and he did not hear any of the testimony.

The record reveals that at the conclusion of the interrogation Board Member Greene—the clerk-typist assigned to Mr. Boynton as his secretary—moved that applicant be excluded from the United States as an alien immigrant, and Member Alves seconded the motion. If we are to believe the testimony of the Chairman of the Board, this record of Immigration and Naturalization Service does not disclose the truth for, according to Mr. Boynton's testimony, Mr. Alves was not present at any time during the hearing but was "busy downstairs" and could not have heard the motion made by Member Greene.

On the witness stand Mr. Boynton testified that after the questions and answers had been typed upon the paper by Member Greene and the motion made by her, he took the paper downstairs to Member Alves and gave him the typewritten record to read. After reading it, Member Alves voted to exclude petitioner. Then, having obtained Member Alves' vote to exclude, the Chairman of the Board took the paper back upstairs where he voted to make exclusion unanimous.

Boards of inquiry are required to be composed of three members. It would appear that in fact this one was composed of one member only—the Chairman of the Board. It would be rather beyond belief that the Secretary of the Chairman of the Board—a grade two or three clerk-typist assigned to him as his secretary—would not see eye-to-eye with her supervisor (the Chairman of the Board) in matters like this. And of course the third member of the board was never at any time present at the hearing.

Certainly it was not contemplated by Congress that where a special board of inquiry was required to pass upon a citizen's rights one member could be absent and could cast his vote simply by reading a typewritten record of proceedings which he did not attend and without his ever having seen the applicant or having heard testimony.

This is the sort of "administrative procedure" which caused investigation in Congress relative to administrative agencies constituting themselves prosecutors, juries and judges at one and the same time. This is the activity condemned by the Supreme Court in Wong Yang Sung v. McGrath, 339 U.S. 33, 70 S.Ct. 445, 94 L.Ed. 616.

If the real issue in the case at bar is whether plaintiff voted voluntarily, we have contradictory statements made by him. On numerous occasions he has stated, as he did in this court, that his voting was involuntary and under duress. The sole and only contradiction we have to such statement appears in the record as prepared by the board of special inquiry conducted by Chairman Boynton as hereinbefore outlined, where (according to Chairman Boynton's record) petitioner admitted that he had voted in the presidential election in Mexico and that such voting was voluntary. The government contends we should accept this one statement as conclusive.

However, statements made before a board of special inquiry are not conclusive, and it is up to this Court to determine whether it will accept statements made by petitioner before this Court, and at other times, or the solitary admission made before the board of special inquiry conducted as hereinabove described. We are satisfied with the judicial climate surrounding the parties when they appeared before this Court. We are not satisfied with the climate surrounding petitioner when he testified before the board of special inquiry.

Facts similar to those at bar concerning contradictory statements are found in United States ex rel. Leong v. O'Rourke, D.C., 125 F.Supp. 769, where at page 770, the Court says:

"To establish that petitioner is an alien the Government wholly relies upon a single statement given by him to one of its investigators in 1949, wherein petitioner made certain admissions against his interest in saying that he was born in China.
* * *

* * * * *
" * * * On April 14, 1953 a hearing was had as to the deportability of petitioner. The only evidence received at such hearing was that of petitioner, mainly in identification of a copy of the statement given to Inspector McDermott. Notwithstanding the contents of such statement, petitioner at this hearing reasserted his birth in San Francisco on October 10, 1907.
* * *

"Following this hearing the Special Inquiry Officer recommended that petitioner be deported as an

alien for the reasons stated in his warrant of arrest. Such recommendation was sustained by the Board of Immigration Appeals. * * * In other words, the solitary evidence upon which the order of the Immigration and Naturalization Service for the deportation of petitioner depends is the disbelief of petitioner's claim to birth in San Francisco and the acceptance of his admission against interest that his birth was in China; holding such admission to be conclusive and substantive evidence of petitioner's alienage, they found him to be deportable under the charge contained in the warrant of arrest.

\* \* \* \* \*

" * * * But we find no authority which holds, as contended by respondent, that an admission against interest is conclusive of the fact admitted under all conditions. On the contrary, it is held that other evidence in a case may render an admission against interest wholly insufficient to establish the fact for which it was offered in evidence. * * * Whether an admission against interest should be held conclusive depends on the facts and circumstances surrounding the making thereof and facts which are revealed as being its premise. * * * "

 In the case at bar the sole evidence that petitioner voted voluntarily is contained in the record made by the board of special inquiry. Citizenship is a very valuable thing. It is not to be lightly taken away. Also, there is a standard of proof required in denaturalization cases. The Supreme Court, on December 12, 1955, reversed the lower court in the case of Gonzales v. Landon, 350 U.S. 920, 76 S.Ct. 210, a case similar to the case at bar, upon the ground the evidence in that case did not reach the standard of proof required in denaturalization cases and that the rule as laid down in Schneiderman v. United States,

320 U.S. 118, 63 S.Ct. 1333, 87 L.Ed. 1796; and Baumgartner v. United States, 322 U.S. 665, 64 S.Ct. 1240, 88 L.Ed. 1525 is applicable to expatriation cases arising under Section 401(j) of the Nationality Act of 1940.* The same rule should apply to the Immigration and Nationality Act of 1952. We are of the opinion in the case at bar that proof falls far short of meeting the standard required in denaturalization cases.

Judgment should be entered decreeing that petitioner herein is a citizen of the United States.

Findings of Fact, Conclusions of Law and Judgment are to be prepared by counsel for petitioner in accordance with the foregoing Memorandum of Opinion for presentation to this Court for signature on or before April 27, 1956.

---

\* Now Immigration and Nationality Act 1952, § 349(a), 8 U.S.C.A. § 1481(a).