## UNITED STATES v. BALOGH.
### No. 53, Docket 20312.

Circuit Court of Appeals, Second Circuit.

Oct. 31, 1946.

Judgment Vacated Jan. 20, 1947.

Hayden C. Covington, of Brooklyn, N. Y., for appellant.

Vine H. Smith, and J. Vincent Keogh, U. S. Atty., both of Brooklyn, N. Y. (Anthony G. Greco, Asst. U. S. Atty., of Brooklyn, N. Y., of counsel), for appellee.

Before L. HAND, SWAN, and FRANK, Circuit Judges.

L. HAND, Circuit Judge.

Balogh appeals from a judgment, convicting him of failing to report for induc-

tion into the Army. Both sides waived a jury, and the case was tried to a judge who, at the conclusion of the testimony, found Balogh guilty as charged, and sentenced him to two years imprisonment. Balogh did not dispute that he refused to appear at the time directed in the induction order; but he offered as a defence that the order was itself invalid, because he was entitled to an exemption under § 5(d) of the Act, 50 U.S.C.A.Appendix, § 305(d). The precise issue was whether the local and appeal boards had given him a fair hearing. As the evidence at the trial did not dispute the correctness of the record of the hearings before the boards, or seek to supplement it, Balogh's guilt depends on the contents of that record, which disclosed the following facts. Balogh registered on March 26, 1945, and filled out and returned his questionnaire on the 13th of April, in which he declared that he was a "window clerk" at the Empire Trust Company, had had ten months of experience in that kind of work, and was not engaged in any other "business or work." He also stated that he was "a minister of religion," that he did "customarily serve as a minister," and that he had been "a minister of Jehovah's Witnesses since September, 1944." On the other hand, he also stated that he was "a student preparing for the ministry in a theological or divinity school," and that he was "attending the Watchtower Bible and Tract Society." He claimed exemption both as "minister" and "student" under § 5(d). The local board unanimously classified him "I-A"; and on the 16th it sent him a notice to report for "pre-induction physical examination." He did so report and was found qualified on the 21st; and on the 23rd, he asked for a hearing before the board. On that day the New York City "Headquarters" sent his file for an opinion to an "Advisory Board Theological Panel" made up of three members, one of whom was apparently a minister, and all of whom we were told at the bar were Protestant clergymen, though none had any specialized acquaintance with Jehovah's Witnesses, so far as appears. On May 3rd, the New York City Director requested Balogh to appear in New York for a hearing before the "Panel," which he did on May 9th, and he was then examined.

His testimony was confusing, and to some extent inconsistent, as to whether he was already a "minister" in the sect of Jehovah's Witnesses, or only a student studying to become one. At first he said that he was "not yet" a minister, though he would become one when he should finish his course, which would be as soon as he felt that he knew enough to preach to others. One becomes a "witness" when he has "fully consecrated his life to the will of Jehovah God"; one becomes a "minister" when one thinks one has enough knowledge of the Bible to know that one is a minister. For example, at the school where he was studying, fifteen of the students were already "ministers" and ten were not. He asked exemption in order to continue his study in preparation for the ministry; although, when he had finished the course, he would have no more authority as a minister than he had at the time. Upon this testimony the "Panel" reported to "Headquarters" on May 9th. The report began with an interpretation of the words, "regular," and, "ordained," in § 5(d), which the "Panel" understood to mean "one duly set apart from the body of members to perform special duties"; in contrast with the use of the word "minister" by Jehovah's Witnesses, which "seems to be applied to every member." The only Jehovah's Witnesses who were set apart for "special duties," were engaged in administrative work, and could not be deemed ministers at all. The Quakers were an example of a sect to which § 5(d) could not apply because, since "religious duties are laid equally upon, and religious functions are performed equally by, members of the Meeting * * * none * * * can claim to be a minister." For these reasons, which the "Panel" further amplified, it was "necessary to disregard entirely the use of the word, 'minister,' by the registrant and by other members of his sect; and to study whether he has been set apart from his fellows for special duties and functions" which "are those of a minister as that word is intended by Congress." Against the "possibility" that Balogh might

prove to be so set apart, "if he devotes all his time to teaching and preaching the religion," the "Panel" recommended that the board should examine him further. The report concluded with a finding that he was not a "student."

"Headquarters" returned the report to the local board on October 23rd, and Balogh appeared before the board on November 5th, and again testified. He then said that he had been going to the "Watchtower Bible and Tract Society" for seven or eight years, that he was studying, but that there was no definite period for the conclusion of his studies. He would become a minister "when I am baptized and consecrate myself to Jehovah God." He had not yet made the decision to become a minister, yet he was a minister, having so decided when he was seventeen, and having been baptized in April of 1945. He had decided to become a minister in May or June. He went from door to door telling people that he was a minister and showing his card; his habit was to tell them that he was there to help them to save their souls, and was authorized to wean them away from their sins. Such interviews occupied five to ten minutes, if his hearers were interested. The record does not show whether he was told how the "Panel" had reported, or who were its members. At the conclusion of his testimony the board again found against him, the chairman of the board, who had done most of the examining addressing him as follows: "Your contention is untrue that the reason why there are no members of Jehovah's Witnesses in the armed forces is that they keep themselves apart from the world. They don't keep themselves apart from the world any more than you do—so how could you say you would be serving man by entering the Army or Navy. All that you are interested in is evading the service of your country." On November 16th Balogh appealed to the appeal board, which on December 3rd affirmed the local board's decision; on December 12th, he sought to take an appeal to the President, and this too proved ineffectual; and on December 12th he was directed to appear for induction on the 18th. This he failed to do, and it was for this failure that he was indicted.

■■ Jehovah's Witnesses appear to be a sect of a kind by no means uncommon in religious history, which relies for the inspiration of preachers and members alike upon the Inner Light of immediate personal conviction, ineffable but none the less imperative, which invades its possessor's being with an irrefragible authority. One begins to preach when the Spirit clearly manifests itself; there is no definite division setting apart a preacher or "minister." It is idle to expect from such a cult an established, or even an ascertainable, canon of ordination; indeed, it is of its essence that ritual, and even definite dogma, shall be discarded, and that in their place shall be substituted the enlightenment, incommunicable in words, which emanates directly from the Source. The identity of the content of that enlightenment in the minds of the votaries ordinarily depends upon the mutual awareness of a like infusion of all by the Spirit. Yet it would be a misapprehension to exclude such sects from the purpose of Congress, to which we are to impute, not only a tolerance of, but a positive concern for, the preservation of all creeds that can be grouped within the widely comprehensive term, "religion." It is irrelevant that, in application, it is likely that malingerers will find an escape from their military duties in the loose and vague terms in which honest professors are forced to express themselves: that may justify more searching scrutiny than ordinary, but it also demands a more complaisant approach. Clearly, the Director of Selective Service was of this mind towards Jehovah's Witnesses, as appears from "Opinion No. 14," which we quote in extenso in the margin.[1] This was a direction for the guidance of local boards; and it was written

---

[1] Vol. III Opinion No. 14 (Amended) National Headquarters Selective Service System Subject: Ministerial Status of Jehovah's Witnesses.

Facts: Jehovah's witnesses claim exemp- tion from training and service and classification in Class IV-D as duly ordained ministers of religion under section 5(d), Selective Training and Service Act of 1940, as amended, and section 622.44, Selective Service Regula-

in exactly the temper which the subject-matter required; it recognized that in this sect the lines were blurred between preachers and laity; that it was even doubtful whether any lines could be said to exist at all; but that this did not dispense with solicitous inquiry in every case; an inquiry to be conducted without resort to general rules, such as were proper enough in dealing with established and articulated religious cults.

The concluding remarks of the chairman of the local board show that he at least did not understand his duties in the spirit

tions, Second Edition, which read as follows:

Section 5(d):

"Regular or duly ordained ministers of religion, and students who are preparing for the ministry in theological or divinity schools recognized as such for more than one year prior to the date of enactment of this Act, shall be exempt *from training and service (but not from* registration) under this Act."

Section 622.44:

"Class IV-D: Minister of religion or divinity student. (a) In Class IV-D shall be placed any registrant who is a regular or duly ordained minister of religion or who is a student preparing for the ministry in a theological or divinity school which has been recognized as such for more than 1 year prior to the date of enactment of the Selective Training and Service Act (September 16, 1940).

"(b) A 'regular minister of religion' is a man who customarily preaches and teaches the principles of religion of a recognized church, religious sect, or religious organization of which he is a member, without having been formally ordained *as a minister of religion;* and who is recognized by such church, sect, or organization as a minister.

"(c) A 'duly ordained minister of religion' is a man who has been ordained in accordance with the ceremonial ritual or discipline of a recognized church, religious sect, or religious organization, to teach and preach its doctrines and to administer its rites and ceremonies in public worship; *and who customarily* performs those duties."

Question.—May Jehovah's Witnesses be placed in Class IV-D as regular or duly ordained ministers of religion exempt from training and service?

Answer:

1. The Watchtower Bible and Tract Society, Inc., is incorporated under the laws of the State of New York for charitable, religious, *and scientific purposes.* The unincorporated body of persons known as Jehovah's Witnesses hold in common certain religious tenets and beliefs and recognize as their terrestrial governing organization the Watchtower Bible and Tract Society, Inc. By their adherence to the organization of this religious corporation, the unincorporated body of Jehovah's Witnesses are considered to constitute a recognized religious sect.

2. The unusual character of organization of Jehovah's Witnesses renders comparisons with recognized churches and religious organizations difficult. Certain members of Jehovah's Witnesses, *by reason of the time which they devote,* the dedication of their lives which they have made, the attitude of other Jehovah's Witnesses toward them, and the record kept of them and their work, are in a position where they may be recognized as having a standing in relation to the organization and the other members of Jehovah's Witnesses similar to that occupied by regular or duly ordained ministers *of other religions.*

3. Members of the Bethel Family are those members of Jehovah's Witnesses who devote their full time and effort to the manufacture and production of books, pamphlets, and supplies for the religious benefit of Jehovah's Witnesses, the purpose of which is to present the beliefs of Jehovah's Witnesses, and to convert others. For their religious services, *the members of this group receive* their subsistence and lodging and in addition a very modest monthly allowance. This group of individuals consist of the office and factory workers at 117 Adams Street, Brooklyn, New York, and workers in the executive offices at 124 Columbia Heights, Brooklyn, New York, and at the Farms. Pioneers of Jehovah's Witnesses are those members of Jehovah's Witnesses *who devote all or substantially all of their time to the work of teaching the tenets of their religion and in the converting of others to their belief. A certified official list of members of the Bethel Family and pioneers is being transmitted to the State Directors of Selective Service by National Headquarters of the Selective Service System simultaneously with the release* of this amended Opinion. The members of the Bethel Family and pioneers whose names appear upon such certified official list come within the purview of section 5(d) of the Selective Training and Service Act of 1940, as amended, and they may be classified in Class IV-D. The status of members of the Bethel Family

of these directions. He was condemning Jehovah's Witnesses as a whole, when he said that all that "you are interested in is evading the service of your country." Had this been a conclusion addressed to Balogh individually, the result of an impartial appraisal of his personal refusal, it might indeed have been immune from attack in the courts. It was not; it was a conclusion denying the exemption to Balogh because of his membership, and not professing to detect him personally as a sham. We should for that reason hesitate to accept the denial of the exemption, made as it was in that humor, even if the record were otherwise without flaw; but it is not. On the contrary the report of the "Panel" independently invalidated the board's proceedings under our decision in United States ex rel. Levy v. Cain.[2] We there reversed the board for two reasons: first, because the "Panel" was anonymous, and second, because its report invaded the board's functions, and we could not tell how far it had influenced the decision. The report at bar was even more vulnerable. As we have already said, we cannot find that Balogh was told the names of the members either at the hearing before them, or at that before the board; indeed, the record does not show that he even knew what the report had been, or that there had been one. True, the names appeared in the letter from "Headquarters," transmitting the report to the local board; but that leaves it open whether Balogh ever saw the letter; or, when he saw it, if he ever did. As the case comes to us, the board made use of evidence of which Balogh may have been unaware, and which he had no chance to answer: a prime requirement of any fair hearing.

Be that as it may, the report shows that the "Panel" completely misunderstood its functions, if it had any proper functions whatever in such a case, which it did not have, as we shall show. It rested its conclusion upon an interpretation of the statute that Congress did not mean to exempt the ministers of any sect in which laity and ministry or clergy were not separate; a question on which the board had no right to receive advice anyway, and in addition one to which the "Panel" gave the wrong answer. It does not indeed affirmatively appear, as it did in United States ex rel. Levy v. Cain, supra,[3] that any member of the board felt himself bound by this construction of the statute; but that is not enough. "Headquarters" had transmitted the report to the board to use; and the prosecution was bound to prove, when the report contains nothing which the board should have used, that it

and pioneers whose names do not appear upon such certified official list shall be determined under the provisions of paragraph 5 of this Opinion.

4. The original paragraph 4 has been consolidated with paragraph 3 of this amended Opinion.

5. The members of Jehovah's Witnesses, known by the various names of members of the Bethel Family, pioneers, regional servants, zone servants, company servants, sound servants, advertising servants, and back-call servants, devote their time and efforts in varying degrees to the dissemination of the tenets and beliefs of Jehovah's Witnesses. The deference paid to these individuals by other members of Jehovah's Witnesses also varies in a great degree. It is impossible to make a general determination with respect to these persons as to their relationship to Jehovah's Witnesses. Whether or not they stand in the same relationship as regular or duly ordained ministers in other religions must be determined in each individual case by the local board, based upon whether or not they devote their lives in the furtherance of the beliefs of Jehovah's Witnesses, whether or not they perform functions which are normally performed by regular or duly ordained ministers of other religions, and, finally, whether or not they are regarded by other Jehovah's Witnesses in the same manner in which regular or duly ordained ministers of other religions are ordinarily regarded.

6. In the case of Jehovah's Witnesses, as in the case of all other registrants who claim exemption as regular or duly ordained ministers, the local board shall place in the registrant's file a record of all facts entering into its determination for the reason that it is legally necessary that the record show the basis of the local board's decision.

Lewis B. Hershey
Director.

[2] 2 Cir., 149 F.2d 338.
[3] 2 Cir., 149 F.2d 338.

did not affect the decision. Besides, there was not the slightest excuse for sending the case to a "Panel" so constituted. As we have said, the record does not tell us, except for the names, who were the three gentlemen who made it up; but, even though they were Protestant ministers, they could have no proper part in an inquiry involving Jehovah's Witnesses. We hasten to say that we are sure that they gave their services patriotically; the fault was in no sense theirs; they performed what must have been at best an onerous duty, and what may have been much more; they deserve more recognition for their services than perhaps they ever received. But they were put in a position where their specialized knowledge, whatever that may have been, could not be used, as indeed appears from the fact that all they did—or could do—was to lay down instructions to the board, based upon their construction of the intent of Congress, as to which they were not an iota better qualified than the board itself. In United States ex rel. Levy v. Cain, supra,[4] we said that local boards might avail themselves of the help of those versed in the doctrines and practices of the cult of which the registrant claims to be a minister, or in whose schools he claims to be a student; and to that we adhere. Local boards cannot ordinarily know what are the accepted tests for "ordination," or for a "regular" though unordained, ministry without recourse to those who are acquainted from within with the canons and practices of the church or creed in question. So too as to the courses of study which a registrant says he is taking, when he claims exemption as a student. So in the case at bar "Headquarters" might have referred the case to a panel, especially acquainted with the practices of Jehovah's Witnesses, for an opinion whether in accordance with these, Balogh would be recognized as a "regular minister." But the actual "Panel" had no such competence, and did not assume to have; it did all it could do; it construed the statute. Finally, it was to the last degree ingenuous to expect any light from such a panel, which, to act at all, had first to divest itself of those ingrained habits of mind inevitable in any

calling; and to bring a completely detached judgment to a heterodox creed. That is not an impossibility, indeed, perhaps the "Panel" in this case succeeded in mastering the handicap; but handicap it was, and a handicap from which the board itself was free, save as the report may have influenced it. Such a panel could not contribute, and was improperly interjected into the proceedings.

The use made of the report, quite aside from the partiality shown by the board, of which we have already spoken, made the hearing unfair. A question arises whether we should now dismiss the indictment. Obviously, the error of receiving the report cannot be corrected upon another trial; nevertheless, conceivably, from the mouths of the members of the board, the prosecution may be able to satisfy the court that the report had no influence upon the result; and to show that the induction was in all other respects valid. While the chance appears to be slight, we will not say that it is so small as now to demand a dismissal of the indictment.

Judgment reversed; cause remanded.