**UNITED STATES of America**

v.

**T. Vail PALMER, Jr., Appellant.**
**No. 11449.**

United States Court of Appeals
Third Circuit.

Argued Jan. 7, 1955.

Reargued June 6, 1955.

Decided June 20, 1955.

**894**

Harrop A. Freeman, Ithaca, N. Y., for appellant.

Frank K. Tarbox, Asst. U. S. Atty., Philadelphia, Pa. (W. Wilson White, U. S. Atty., Philadelphia, Pa., on the brief), for appellee.

Before BIGGS, Chief Judge, MARIS, GOODRICH, McLAUGHLIN, KALODNER, STALEY and HASTIE, Circuit Judges.

GOODRICH, Circuit Judge.

T. Vail Palmer, Jr. was convicted in the district court for the Eastern District of Pennsylvania for refusing to appear for induction into the armed forces pursuant to the order of a local selective service board. The district court denied

his motion for judgment of acquittal, 122 F.Supp. 938, and he has appealed.

Palmer, a member of the Religious Society of Friends, was convicted in the district court in 1950 for failure to register under the Selective Training and Service Act and he served a term of imprisonment. Just before his release from prison on September 1, 1951, he was registered by the warden in accordance with the selective service regulations and his registration was forwarded to Local Board No. 60 at Media, Pennsylvania. On December 5, 1951, the local board mailed Palmer a classification questionnaire, Form No. 100. He returned it without filling it out or signing it but accompanied it by a letter dated December 9th and signed by him. This letter, and other communications from Palmer, are collected as an Appendix to the majority and minority opinions herein. Also accompanying Palmer's letter was a copy of a statement he had made in the district court when convicted for failing to register. In July 1950, prior to that conviction, Palmer had written the local board two letters, the second being in reply to an order of the board directing him to appear for a conference with regard to registration. On December 17, 1951, the local board received a letter dated December 11th from the Dean of the Graduate School of Theology of Oberlin College giving information as to Palmer's status as a theological student in that institution.

On January 30, 1952, the local board ordered Palmer to report on February 15th for a physical examination, which he failed to do. On February 12, 1952, the board sent him a copy of Form No. 150, the special form for claiming exemption by conscientious objectors, and on February 14th, without waiting for the return of that form, the board classified Palmer in Class I–A. On February 19th the board received the Form No. 150 back from Palmer not filled out but accompanied by a letter signed by him dated February 15th (See Appendix). On April 8, 1952, the board again ordered Palmer to report for a physical examina-

tion, this time on April 16th, and he again failed to do so. Except for copies of the letter and orders sent by the local board to Palmer and the board's correspondence with various officials of the Department of Justice and the Selective Service System respecting his prior indictment, conviction, imprisonment and registration, these five letters and statement constituted the sole information concerning him which was in the local board's file when on May 5, 1952, the board ordered him to report on May 20th for induction into the armed forces. It was his disobedience of that order which resulted in his indictment and conviction in the present proceeding.

■ On behalf of the appellant, Palmer, several arguments are advanced. The first and the one most quickly disposed of is a question about jurisdiction of the Local Board No. 60, Media, Pennsylvania. Palmer was registered while in federal prison in Danbury, Connecticut, and it is suggested that the board in that place and not the board at the place given by Palmer as his home has jurisdiction. This argument is incorrect. The question is clearly answered by regulation 1613.41, 32 C.F.R. § 1631.41(1952). While the procedure for forwarding registration files in cases of this sort has been changed, that change in procedure does not affect the vesting of authority in the local board where the registrant is resident.

■ Second, it is urged that Palmer having once been convicted for failure to register may not now be convicted for failure to report for induction. The theory behind this ingenious argument is that Palmer's opposition to the military establishment is a single thing in his mind and conduct and if that is contrary to law, should be treated as one offense. The recent Supreme Court decision in Bell v. United States, 349 U.S. 81, 75 S.Ct. 620, 622, is instanced to illustrate the point. From that very case comes the answer to the contention. Mr. Justice Frankfurter, speaking for the majority, said "the punishment appropriate for the diverse federal offenses is

a matter for the discretion of Congress, subject only to constitutional limitations * * *." The very fact situation of this case was necessarily included in the decision of the Eighth Circuit in Doty v. United States, 1955, 218 F.2d 93.

Third, this brings us to the really hard point of this case. Here is a man whose good faith as a conscientious objector is not challenged. He likewise may be rejected for service because he has been convicted of the offense of failure to register. Cf. Doty v. United States, supra. As a theological student he was entitled to deferment if he asked for it. See 50 U.S.C.A.Appendix, § 456(g). If he finished his theological course and became a minister of religion he had a further ground, this time for exemption. *Ibid.* The question is well asked: why, if a court knows all this and a local board knows all this, should a man be convicted of an offense against the government for failing to take advantage of what was provided for him?

The expression of differences among members of a court is much easier if the disagreement can come on some technical subject such as whether a given set of facts is sufficient to constitute a breach of contract *in limine.* Here we have the kind of differences in policy where there is little in the way of technical rule to guide us and where there are strong arguments, legal, logical and emotional, to be made on each side of the question.

There were on June 30, 1954, about fifteen and a half million young men registered for military service under the Universal Military Training and Service Act. 62 Stat. 604 (1948), as amended, 50 U.S.C.A.Appendix, § 451 et seq. The administration of the Act was entrusted in the first instance to 3,920 local boards. These boards are composed of citizens only some of whom are lawyers and all of whom serve without pay as a matter of public service. It is apparent that if this enormous man power machine is going to work it demands a high degree of co-operation from everyone involved in it and with it.

No man has a constitutional right to·be free from a call to military service. Selective Draft Law Cases (Arver v. U. S.), 1918, 245 U.S. 366, 38 S.Ct. 159, 62 L.Ed.· 349; United States v. Henderson, 7 Cir., 180 F.2d 711, certiorari denied, 1950, 339 U.S. 963, 70 S.Ct. 997, 94 L.Ed. 1372. However, a sympathetic Congress, desirous to afford a maximum of freedom of conscience, has provided for complete exemption from service for some people and partial exemption for others. It has also provided for a rather elaborate machinery for appeal to make sure that mistakes of local boards do not result in a failure to give any registrant what is due him under the law. There is a method prescribed for handling all these claims for exemption in an orderly way. If rules must be laid down for the handling·of court business, as they are, and the proceedings of administrative bodies, as they are, there is even greater reason for the establishment of orderly procedure with nearly four thousand volunteer boards handling the cases of more than fifteen· million young men. If we had only the problem of one village to consider with one board of citizens to raise a company of militia from that village there would be no need of elaborate rules. Simple things can be handled simply, of course. But that is not our case.

There must come a time when the interest of the citizenry as a whole must be insisted upon if the interests of both majority and dissenters are to be protected. The young man involved in this case says, and we do not doubt his good faith, that he is so much against all war organization that he will not fill out a questionnaire stating his grounds for exemption. It would only be a step further for this or some other·young man to say that he is so much against war that he will not pay taxes to a government which spends the majority of its income to maintain a military establishment. It is only one step further for ·this or some other young man to say that a government which depends upon force to maintain order and to protect itself against aggression of its neighbor is so bad a government that he feels no moral obligation to obey anything it says. It seems to us that all this is the logical outcome of the position which Palmer has taken. The defendant finds it impossible to fill· out a questionnaire but he will write letters to a draft board. In other·words, he wants this department of the government run his way.

In argument and brief we have been given an analysis of the authorities bearing upon the legal question: when must one exhaust his administrative remedies before court help is available? That problem is always interesting and sometimes a very difficult one and we are grateful to counsel for appellant for his analysis of it. However, we do not think we must thread our way among delicate distinctions in this case. This defendant not only has failed to exhaust his administrative remedy; he ignores the whole carefully prepared system altogether. He seems to think that to fill out a questionnaire is like being directed to eat meat offered to idols. We do not think it is. But there must be some point at which a sympathetic society can say to a man, "If you want us to recognize what we admit is your honest belief, although it seems to us ill-founded, you must take certain steps to do it."

These draft cases have made difficult problems for the federal courts for quite a number of years. We list herewith for what it may be worth some of the recent decisions. Doty v. United States, already cited, presents a set of facts very close to this one and conviction was upheld. In Estep v. United States, 1946, 327 U.S. 114, 66 S.Ct. 423, 428, 90 L.Ed. 567, the Supreme Court specifically said that Falbo v. United States, 1944, 320 U.S. 549, 64 S.Ct. 346, 88 L.Ed. 305, did not preclude the defenses asserted because the registrants in the Estep cases "had pursued their administrative remedies to the end. All had been done which could be done." While in Dickinson v.·United States, 1953, 346 U.S. 389, 74 S.Ct. 152, 98 L.Ed. 132, attention was given to the point that administrative

remedies had been exhausted by the defendant. What the Supreme Court was doing in these cases was not contrary to Falbo v. United States, supra.

The case of United States v. Balogh is also very illuminating. This case is reported at 2 Cir., 1946, 157 F.2d 939 (exhaustion rule not applied), vacated and remanded on per curiam opinion, 1947, 329 U.S. 692, 67 S.Ct. 625, 91 L.Ed. 605 (with directions to consider Falbo v. United States), 2 Cir., 1947, 160 F.2d 999 (exhaustion rule applied), certiorari denied, 1947, 331 U.S. 837, 67 S.Ct. 1522, 91 L.Ed. 1850. In the following circuit court cases attention was called to the fact that administrative procedures had been availed of, Tamblyn v. United States, 5 Cir., 1944, 216 F.2d 345; Williams v. United States, 5 Cir., 1954, 216 F.2d 350; Moon v. United States, 5 Cir., 1955, 220 F.2d 730; while in the following cases complete exhaustion of administrative remedies was required, United States v. Balogh, supra; Doty v. United States, supra; Kalpakoff v. United States, 9 Cir., 1954, 217 F.2d 748; Williams v. United States, 9 Cir., 1953, 203 F.2d 85; Skinner v. United States, 9 Cir., 1954, 215 F.2d 767; Mason v. United States, 9 Cir., 1955, 218 F.2d 375; United States v. Rumsa, 7 Cir., 1954, 212 F.2d 927. Cf. Olinger v. Partridge, 9 Cir., 1952, 196 F.2d 986.

As we have already said, however, we do not think these cases bear upon our problem except by inference because here the whole remedial process has been ignored by the defendant.

We do not say for a moment that this defendant is like the rat-like characters who so often come into criminal courts. He may be the prophet of a new day or he may be more dangerous than some of the rat-like characters because his type of refusal to co-operate, if sufficiently widespread, would make organized society impossible. In any event, we think the trial judge showed good sense in not sending him to jail. But it also seems to the majority of us that the conviction was right.

The judgment of the district court will be affirmed. 122 F.Supp. 938.

MARIS, Circuit Judge (dissenting).

While I am in accord with the views of the majority as to the first and second points raised by Palmer on this appeal I must dissent from their conclusion that his failure to fill out and file the prescribed forms and to pursue the administrative remedies open to him precluded him from attacking in the district court the validity of the local board's orders classifying and inducting him.

I think that all the information in the file which was before the local board in Palmer's case supports the conclusion, to which the district court came, that he is a sincere conscientious objector who would have been entitled to a I–O classification if he had properly submitted the facts of his case to the selective service system. Likewise I find no support in the record for any other conclusion than that at the time the board acted Palmer was a theological student satisfactorily pursuing a full time course of instruction in a recognized theological school, which would entitle him to a IV–D classification or in any event to a I–S classification on May 5, 1952 when he was ordered to be inducted. It is equally clear from the record, I believe, that Palmer's refusal to register and to fill out his questionnaire and his Form No. 150 was based upon his conscientious objection to participation in war in any form, which he believes he must carry to the extreme length of refusing to participate in any way, even for his own exemption, in the procedure prescribed by the Universal Military Training and Service Act for obtaining personnel for the armed forces.

The district court held that Palmer's failure to fill out the prescribed forms furnished to him by the local board justified the board in wholly ignoring the information regarding him contained in its file and classifying him in Class I–A. I do not think that the law or the regulations thus exalt form over substance. On the contrary the regulations make it

perfectly clear that it is the duty of a local board, in classifying a registrant, to consider all written information contained in his file and not merely the official forms. Thus § 1622.1(c) of the Selective Service Regulations provides:

"(c) It is the local board's responsibility to decide, subject to appeal, the class in which each registrant shall be placed. Each registrant will be considered as available for military service until his eligibility for deferment or exemption from military service is clearly established to the satisfaction of the local board. *The local board will receive and consider all information, pertinent to the classification of a registrant, presented to it.* The mailing by the local board of a Classification Questionnaire (SSS Form No. 100) to the latest address furnished by a registrant shall be notice to the registrant that *unless information is presented to the local board,* within the time specified for the return of the questionnaire, which will justify his deferment or exemption from military service the registrant will be classified in Class I–A." (Emphasis supplied) 32 CFR, Rev.1951, § 1622.-1(c).

Likewise § 1623.1(b) of the regulations provides, in pertinent part:

"(b) The registrant's classification shall be determined *solely on* the basis of the official forms of the Selective Service System *and such other written information as may be contained in his file; * * *"* (Emphasis supplied) 32 CFR, Rev. 1951, § 1623.1(b).

It is thus authoritatively laid down that the local board in classifying a registrant must consider all the information in his file concerning his draft status. The Congress in the Universal Military Training and Service Act made specific provision for the exemption from military training and service of theological students and of sincere conscientious objectors to such training and service.

I find nothing in the act or regulations to support the conclusion that a conscientious objector should be refused the appropriate classification and placed in Class I–A merely because his conscientious scruples against participation in war extend to participation in the preparatory procedure as well. To hold otherwise would be to impute to the Congress which has fully recognized the position of conscientious objectors and provided exemption for them as a class an intention to withhold that exemption from and to brand as felons those members of the class which have the most sensitive consciences of all the group. This I certainly cannot do.

It follows that the local board in classifying Palmer should have considered all the information in his file, including his letters and statement and the letter from Dean Stidley of the Graduate School of Theology of Oberlin College.

It thus appears that when the local board classified Palmer in Class I–A it acted in plain violation of the law and regulations which required it to consider the material in his file in performing its duty "to hear and determine * * * all questions or claims with respect to inclusion for, or exemption or deferment from, training and service under this title [the Universal Military Training and Service Act] of all individuals within the jurisdiction of such local boards." 50 U.S.C.A.Appendix, § 460(b) (3). Moreover it must be concluded that there was no basis in fact for the classification which the board made. For all the materials in Palmer's file point to the fact that he was a theological student satisfactorily pursuing a full time course in a well known theological school and that he was conscientiously opposed to participation in war in any form. There was nothing to raise an inference or even a suspicion to the contrary. Indeed the district court in its opinion was at pains to point out Palmer's apparent sincerity. His sincerity is further attested by his willingness to undergo imprisonment, as he did, rather than participate in the selective service process, although, if he

had been willing to do the latter, he would undoubtedly have been granted an exemption from military service. I would, therefore, hold upon the authority of Estep v. United States, 1946, 327 U.S. 114, 66 S.Ct. 423, 90 L.Ed. 567, and Dickinson v. United States, 1953, 346 U.S. 389, 74 S.Ct. 152, 98 L.Ed. 132, that the local board's action in classifying Palmer in Class I–A was beyond its jurisdiction and void.

The Government asserts, however, that the invalidity of his classification is not available to Palmer as a defense to his present prosecution because he failed to exhaust the administrative remedies open to him to secure its correction. Falbo v. United States, 1944, 320 U.S. 549, 64 S.Ct. 346, 88 L.Ed. 305, is relied upon as authority for this proposition. If the Supreme Court in the Falbo case intended to hold that a registrant who refuses to obey an order to report for induction which is clearly beyond the jurisdiction of the local board and, therefore, void may never, under any circumstances, defend a criminal prosecution brought for his failure to obey it if he has not exhausted all intermediate administrative remedies open to him, the Government's position is right. But I do not think that the Falbo case may be taken to go so far. For in Estep v. United States, 1946, 327 U.S. 114, 66 S.Ct. 423, 90 L.Ed. 567, the Supreme Court laid down the rule that if a classification by a local board is without any basis in fact, it is beyond the board's jurisdiction and its invalidity may be asserted as a defense to a prosecution for declining to submit to induction pursuant to the board's subsequent induction order. The basis for the Court's conclusion was that to hold otherwise, in the absence of clear language in the Act, would not square with our concepts of justice. In this connection the Court said, 327 U.S. at pages 119–123, 66 S.Ct. at page 426:

"By the terms of the Act Congress enlisted the aid of the federal courts only for enforcement purposes. * * * But § 11 is silent when it comes to the defenses, if any, which may be interposed.

"Thus we start with a statute which makes no provision for judicial review of the actions of the local boards or the appeal agencies. That alone, of course, is not decisive. * * * Judicial review may indeed be required by the Constitution. Ng Fung Ho v. White, 259 U.S. 276, 42 S.Ct. 492, 66 L.Ed. 938. * * *

"The authority of the local boards whose orders are the basis of these criminal prosecutions is circumscribed both by the Act and by the regulations. Their authority to hear and determine all questions of deferment or exemption is, as stated in § 10(a) (2), limited to action 'within their respective jurisdictions.' It is only orders 'within their respective jurisdictions' that are made final. It would seem, therefore, that if a Pennsylvania board ordered a citizen and resident of Oregon to report for induction, the defense that it acted beyond its jurisdiction could be interposed in a prosecution under § 11. * * *

"Any other case where a local board acts so contrary to its granted authority as to exceed its jurisdiction does not stand on a different footing. * * * If a local board ordered a member of Congress to report for induction, or if it classified a registrant as available for military service because he was a Jew, or a German, or a Negro, it would act in defiance of the law. If a local board refused to reopen on the written request of the State Director a registrant's classification and refused to cancel its order to report for induction, it would be acting in the teeth of the regulations. In all such cases its action would be lawless and beyond its jurisdiction.

"We cannot read § 11 as requiring the courts to inflict punishment on registrants for violating whatever orders the local boards might

issue. We cannot believe that Congress intended that criminal sanctions were to be applied to orders issued by local boards no matter how flagrantly they violated the rules and regulations which define their jurisdiction. We are dealing here with a question of personal liberty. A registrant who violates the Act commits a felony. A felon customarily suffers the loss of substantial rights. Sec. 11, being silent on the matter, leaves the question of available defenses in doubt. But we are loath to resolve those doubts against the accused. We cannot readily infer that Congress departed so far from the traditional concepts of a fair trial when it made the actions of the local boards 'final' as to provide that a citizen of this country should go to jail for not obeying an unlawful order of an administrative agency. We are loath to believe that Congress reduced criminal trials under the Act to proceedings so barren of the customary safeguards which the law has designed for the protection of the accused. The provision making the decisions of the local boards 'final' means to us that Congress chose not to give administrative action under this Act the customary scope of judicial review which obtains under other statutes. It means that the courts are not to weigh the evidence to determine whether the classification made by the local boards was justified. The decisions of the local boards made in conformity with the regulations are final even though they may be erroneous. The question of jurisdiction of the local board is reached only if there is no basis in fact for the classification which it gave the registrant."

I think that the Supreme Court in the Falbo case merely applied the rule that failure to exhaust administrative remedies precludes resort to the courts [1] to the extent of holding that the defense of invalidity of the board's order was not available to Falbo since he had not exhausted the administrative remedies open to him subsequent to the order for induction. For the order for induction was not final under the procedure then in effect.[2]

The Court stated that the narrow question presented was "whether Congress has authorized judicial review of the propriety of a board's classification in a criminal prosecution for wilful violation of an order directing a registrant to report for the last step in the selective process" and the Court found that Congress had not done so, stating, 320 U.S. at page 554, 64 S.Ct. at page 349:

"* * * The Act nowhere explicitly provides for such review and we have found nothing in its legislative history which indicates an intention to afford it. The circumstances under which the Act was adopted lend no support to a view which would allow litigious interruption of the process of selection which Congress created. To meet the need which it felt for mobilizing national manpower in the shortest practicable period, Congress established a machinery which it deemed efficient for inducting great numbers of men into the armed forces. Careful provision was made for fair administration of the Act's policies within the framework of the selective service process. But Congress apparently regarded 'a prompt

---

1. Myers v. Bethlehem Shipbuilding Corp., 1938, 303 U.S. 41, 50–51, 58 S.Ct. 459, 463, 82 L.Ed. 638: "* * * the long-settled rule of judicial administration that no one is entitled to judicial relief for a supposed or threatened injury until the prescribed administrative remedy has been exhausted."

2. At that time the regulations called for a physical examination at the induction center as a result of which the registrant might be rejected at that final stage. The regulations have since been amended to provide for a preinduction physical examination. See Gibson v. United States, 1946, 329 U.S. 338, 67 S.Ct. 301, 91 L.Ed. 331.

and unhesitating obedience to orders' issued in that process 'indispensable to the complete attainment of the object' of national defense. * * * Surely if Congress had intended to authorize interference with that process by intermediate challenges of orders to report, it would have said so."

But in the light of the Estep case I cannot take this language to mean that Congress has precluded, under any and all circumstances, a defendant in a criminal prosecution for failure to obey an induction order from defending upon the ground of the invalidity of the order if he has not pursued all the intermediate administrative remedies open to him prior to the final administrative action. For it will be recalled that in the Estep case Justice Douglas, speaking for the Court, said, 327 U.S. at pages 121–122, 66 S.Ct. at page 427:

"We cannot read § 11 as requiring the courts to inflict punishment on registrants for violating whatever orders the local boards might issue. We cannot believe that Congress intended that criminal sanctions were to be applied to orders issued by local boards no matter how flagrantly they violated the rules and regulations which define their jurisdiction. We are dealing here with a question of personal liberty."

The courts of appeals and district courts have been divided as to whether exhaustion of all administrative remedies must be shown in these selective service cases.[3] Moreover it may well be argued that section 10 of the Administrative Procedure Act[4] has broadened the scope of judicial review in these cases.[5] For the Universal Military Training and Service Act expressly excludes from the operations of the Administrative Procedure Act only the "functions performed under this Act."[6] Judicial review is hardly a function performed under the Universal Military Training and Service Act, especially since the act is silent on the subject.

Accordingly I do not think that the law is inflexibly to the effect that never, under any circumstances, could the courts permit the defense of the invalidity of the board's order to be interposed if the registrant had not exhausted his intermediate administrative remedies. For the doctrine of exhaustion of administrative remedies is not an inflexible rule of the law and in appropriate cases the courts have declined to apply it.[7] Thus if an agency has acted beyond its power or jurisdiction the courts have, in the interests of justice sometimes permitted that fact to be relied upon in defense even though administrative remedies have not been wholly exhausted.[8] The present case seems to me to be of this exceptional kind.

It is perfectly clear that the Congress intended that divinity students and sincere conscientious objectors should be exempted from military service. The action of the local board in failing to follow the Congressional mandate obliterated a right which the Congress had grant-

---

3. With the cases cited by the majority compare United States v. Greene, 7 Cir., 1955, 220 F.2d 792; Rempel v. United States, 10 Cir., 1955, 220 F.2d 949; Ex parte Fabiani, D.C.E.D.Pa.1952, 105 F.Supp. 139; United States v. Shaw, D.C.W.D.N.Y.1953, 118 F.Supp. 849; United States v. Giessel, D.C.D.N.J.1955, 129 F.Supp. 223.

4. 5 U.S.C.A. § 1009.

5. Compare Shaughnessy v. Pedreiro, 1955, 349 U.S. 48, 75 S.Ct. 591.

6. 50 U.S.C.A.Appendix, § 463.

7. Davis on Administrative Law, 1951, §§ 188, 189, 190; 1 Vom Baur, Federal Administrative Law § 233.

8. Gonzales v. Williams, 1904, 192 U.S. 1, 15, 24 S.Ct. 177, 48 L.Ed. 317; Waite v. Macy, 1918, 246 U.S. 606, 38 S.Ct. 395, 62 L.Ed. 892; Skinner & Eddy Corp. v. United States, 1919, 249 U.S. 557, 562–563, 39 S.Ct. 375, 63 L.Ed. 772; United States ex rel. Bradley v. Watkins, 2 Cir., 1947, 163 F.2d 328, 330; United States ex rel. De Lucia v. O'Donovan, 7 Cir., 1950, 178 F.2d 876, 879–880.

ed.[9] Its action in classifying Palmer in Class I–A was, as we have seen, beyond its jurisdiction, being without basis of fact in the record and in the teeth of the regulations which required it to consider all the materials in his file when classifying him. And if the exhaustion of remedies rule is applied here to prevent Palmer from showing these facts in his defense the very basis for the Congressional exemption, to which the district court concedes on the facts he is entitled, will operate to stamp him a felon. For it is perfectly clear that it was solely because of the unusually sensitive nature of his conscientious scruples against war that he found himself unable to pursue the administrative remedies open to him in the selective service system. The Congress could hardly have intended that through the inflexible operation of the exhaustion of remedies doctrine the exemption which it freely accorded to all sincere conscientious objectors should be denied to those alone among them who have shown themselves the most deeply conscientious.

It is worth noting also that even though Palmer had not followed the intermediate administrative procedure available to him the administrative process had ended in his case with the board's order for his induction. For that order was a final one the disobedience of which could be defended, exhaustion of intermediate remedies aside, upon the ground of its invalidity.[10] Permitting him to interpose in this case the defense of the invalidity of the order accordingly cannot have the effect of interrupting the administrative process of selection which is the basic reason for the exhaustion doctrine itself and the consideration which moved the Court to deny the right to interpose the defense of invalidity in the Falbo case. In this respect the pres-

ent case is indistinguishable from Estep. I conclude that Palmer should have been permitted to raise the defense that the board's order for his induction was invalid. I have already shown that the order was wholly void. It follows, I believe, that Palmer was not guilty of a criminal offense in refusing to obey it and that the district court should have granted his motion for a judgment of acquittal.

I think there is an additional reason for holding that Palmer's motion for judgment of acquittal should have been granted. Section 6(i) (2) of the Universal Military Training and Service Act provides that a person who while satisfactorily pursuing a full-time course of instruction at a college, university or similar institution is ordered to report for induction shall be deferred until the end of the academic year. Section 1622.-15(b) of the regulations [11] directs the local board to place such a student in Class I–S. Here the materials in Palmer's file on May 5, 1952 disclosed to the board that he was satisfactorily pursuing a full-time course of study at the Graduate School of Theology of Oberlin College when on that day the board ordered him inducted on May 20th. That induction order was, therefore, in clear violation of the law and regulations regardless of the validity of Palmer's prior classification. Since upon this view the final induction order of the board was invalid regardless of what had gone before and since Palmer was not required to obey it before asserting its invalidity as a defense,[12] I think that the question of exhaustion of administrative remedies does not really arise in the case.

I am authorized to say that Judges McLaughlin and Hastie join in the views expressed in this opinion.

9. Compare Switchmen's Union of North America v. National Mediation Board, 1943, 320 U.S. 297, 300, 64 S.Ct. 95, 88 L.Ed. 61; Order of Ry. Conductors v. Pitney, 1946, 326 U.S. 561, 566, 66 S.Ct. 322, 90 L.Ed. 318.

10. Gibson v. United States, 1946, 329 U.S. 338, 67 S.Ct. 301, 91 L.Ed. 331; Tamblyn v. United States, 5 Cir., 1954, 216 F.2d 345.

11. 32 CFR, Rev.1951, § 1622.15(b).

12. Gibson v. United States, supra; Tamblyn v. United States, supra.

APPENDIX

"Concordville, Penna.
"July 13, 1950
"Selective Service Local Board No. 60
"113 South Ave.
"Media, Penna.

"Dear sirs,

"In September 1948, when the selective service law went into effect, I informed my local draft board in Modesto, Calif. of my refusal to register, as a Quaker and a Christian pacifist. To date they have taken no action on my refusal. Recently I have moved to the address on the head of this letter—Concordville, Penna., and feel that I should inform you of my presence in the area of your jurisdiction, in case any inquiries should be made on my case, or any action is desired to be taken against me. I will be going to seminary in September at Oberlin, Ohio, and will inform you of my address there. I have notified the local board in Modesto of my address change.

"Sincerely yours,
"(Sgd.) T. Vail Palmer, Jr."

"Concordville, Penna.
"July 22, 1950
"Selective Service System
"Local Board No. 60
"Media, Penna.

"Dear Sirs,

"Your letter of July 20 arrived today, directing me to report to your office for a conference on Selective Service regulations. I have been informed that the likely purpose of such a conference would be to carry out the instructions of the Department of Justice that those refusing to register for Selective Service should be called before their local board and asked to give the information required on the registration form, and that if such information is given, the person shall be considered 'automatically registered' under the law, even if he refuses to sign the form, as was clarified in the case of Edgar Norton of Glens Falls, New York.

"Since my conscientious objection to war involves a break with the conscription as a whole, it seems that I would be untrue to my beliefs if I thus allowed myself to be registered. Therefore, I regret to inform you that I feel constrained to disobey the order to report to your office, and to accept whatever consequences may ensue from such action.

"Sincerely yours,
"(Sgd.) T. Vail Palmer, Jr."

"Court Statement of T. Vail Palmer, Jr.

"From the time when Moses brought down from Mt. Sinai the Divine Commandment: 'Thou shalt not kill', there can be seen in the Bible a growing realization that God does not want men to kill or to hate. Jesus Christ, who lived in a land suffering under a foreign, totalitarian oppressor, showed us the way by refusing either to fight or to appease the Romans.

"If killing and hatred are thus wrong, how can war, which is killing and hatred on an enormous scale, be then right; how can God want men to fight? I say from the depths of my heart that to fight, to be a soldier, is unchristian and morally wrong. Yet I cannot condemn those who fight and die for their country. For they are doing the very best they know. It is at least better to kill than to be a coward!

"Men desperately need to see the Christian alternative of sacrificial love for all men. But the federal government, in passing the Selective Service Act, has made this alternative much more difficult. It is easy to believe that the commandment of the state to learn to kill is a moral duty. For in general, laws *should* be obeyed; in a democracy there are very few laws that directly violate God's laws.

"But the very purpose of the Selective Service Act is to require men to do a thing which goes directly against the Divine law of love. I know, indeed, that if I registered I could be exempted as a conscientious objector, that *I* would not be made to do that wrong. But it is not only my own soul that I am concerned about. There are millions of others whom the law compels to become soldiers, and thus to do evil, believing that they are doing good! It is my Christian duty

to disobey any law whose basic purpose is so anti-Christian. Even to register is to accept and support this law. I cannot compromise with such a law!

"Most people feel that war is necessary to avoid the evils of Communism and conquest by Russia. But in our day, Gandhi and his followers have shown—and successfully—that there is another way to overcome evil. Another fact is that, in Nazi Germany and occupied Europe during the last war, many pacifists were leaders in non-violent underground movements against Naziism. I am convinced that, if so great a calamity should ever come as the invasion or occupation of this nation by a totalitarian power, it will again be, among others, the pacifist —and particularly those who now will not compromise—who will refuse to knuckle under and become slaves, but will firmly, yet in love and respect for personality, decline to cooperate with the occupying power. For the pacifist, it takes more than prison or military defeat to take away one's freedom to live, think, and act as whole men and Sons of God."

"Quadrangle
"Oberlin, Ohio
"December 9, 1951
"Selective Service
"Local Board No. 60
"Media Real Estate Co. Bldg.
"113 South Avenue
"Media, Pa.

"Dear sirs:

"SSS Form No. 100 (Classification Questionnaire) was forwarded from Concordville and reached me on December 8, 1951 at the above address, where I am now resident, as a student at the Graduate School of Theology of Oberlin College.

"As you know, my conviction that war and conscription are contrary to God's law led me to refuse to register for Selective Service. This refusal was continued by my refusal to report for conference, as indicated to you in my letter of July 22, 1950. As a result of these actions, I was sentenced by the Federal District Court in Philadelphia for a term of a year and a day, which I have served.

"I realize that my refusal to comply may have put you in an inconvenient situation. Please understand that this was not, and is not, intended personally, that I sympathize with your desire to follow the regulations which you are set up to enforce. I do not intend by my actions any criticism whatever of you in your position. I would not cause this trouble if I were not deeply convinced that the very concept of conscription is essentially unjustifiable to a Christian nation.

"In hope that I may further clarify the reasons for my action, I am enclosing a copy of the 'court statement' I issued at the time of my sentencing. I believe that it is clear from this statement that my act of refusal to register stems from a basic opposition to the Selective Service Act *as a whole,* and that I can thus no more comply with any other portion of that Act than I could with registration.

"I am therefore returning SSS Form No. 100 without filling it out. I hope I have made it clear that I consider this act not as a new and separate disobedience of the Selective Service Act, but simply as a continuance of the act of refusal to register, for which I have already served the legal penalty.

"Sincerely yours,
"(Sgd.) T. Vail Palmer, Jr."
"The Graduate School of Theology
"Oberlin College
"Oberlin, Ohio.
"December 11, 1951
"Office of the Dean
"Selective Service
"Local Board No. 60
"Media Real Estate Co. Bldg.
"113 South Avenue
"Media, Pa.

"Gentlemen:

"T. Vail Palmer, Jr., is a First Year student in the Graduate School of Theology, and is currently pursuing a full time course of 16 semester hours. The course in which he is enrolled requires 90 semester hours and ordinarily takes

three years. This current year he won a competitive entrance scholarship, and is a student in good standing.

"This information is sent in order to throw light upon his Selective Service status.

"If there are any questions concerning him, I shall welcome an opportunity to try to answer such.

"Sincerely,

"(Sgd.) Leonard A. Stidley
Dean"

"Quadrangle
"Oberlin, Ohio
"February 15, 1952

"Selective Service
"Local Board No. 60
"Media Real Estate Co. Bldg.
"113 South Avenue
"Media, Penna.

"Dear sirs:

"I believe that God is an infinite personal being. His nature of justice and love is revealed to us in the experiences of the leaders of all religions, and particularly in the Old and New Testaments, in the person of Jesus Christ, and in the Spirit, the Light Within, that guides men in their lives today. The love of God for us is the supreme fact of the universe and demands our highest loyalty, faith, and obedience. Even the Christian commandment of love to all men derives from God's love for us, which sends us forth to love others. So much the more, then, are the demands for human justice and for obedience to human authority subordinate to God's will.

"God's love is never coercive; he never forces us to do anything. Likewise, our love of all men should be exercised without force or coercion. I am not sure that force can ultimately be justified in any sphere of human relationships.

"Much of my belief in pacifism came as a result of my being raised in a Quaker pacifist family. My present position was largely clarified in the sharing of a small group of young Friends that met weekly in Philadelphia for worship, meditation, and fellowship from 1946 to early 1948.

The most influential member of that group was Robert M. Hazelton. Many individuals have provided guidance in my religious growth; I cannot point to any one person who is at present outstanding in this matter.

"My present enrollment in theological seminary, my experiences in the past 3 years of having led 2 Bible study groups, and my having become a member of the Kirkridge movement last fall would probably be the most obvious outer indications that I consider my basic orientation to be religious. My year and a day sentence to federal prison for refusal to register for Selective Service should indicate the extent of my pacifist convictions.

"The most direct public statement of my stand was the court statement I issued at the time of my sentencing for refusal to register, a copy of which I have sent you with my letter of December 9, 1951. My article, 'The Essence of Liberty' in the October 20, 1951 issue of *Friends Intelligencer*, and my letter in the July 7, 1951 issue of *The Peacemaker*, deal with the question of how a conscientious objector should act in prison. I have spoken or led discussions a number of times on matters relating to peace or to my stand. The most significant of these was at a public meeting sponsored by the F.O.R. in New York City, October 1, 1950, where I spoke on my stand, from the same platform as A. J. Muste and Milton Mayer, leading U. S. pacifists.

"I attended Concord School No. 1, Concordville, Pa. (public) from 1933 to 1940; West Chester High School, West Chester, Pa. (public) 1940–1942; George School, George School, Pa. (church) 1942–1944; University of Pennsylvania, Philadelphia, Pa., 1944–1948; Modesto Junior College, Modesto, Calif. (public), 1949–1950; Graduate School of Theology, Oberlin College, Oberlin, Ohio (church), 1951–. From 1948 to 1950 I worked as a farm worker at Tuolumne Co-operative Farms, Rt. 8, Box 1959, Modesto, Calif. In 1950 I did 'handy man' work for John Wolf, Concordville, Pa.

"My addresses have been: Concordville, Penna., 1931–1951; Box 448, U. of Penn. Dorms, 37th & Woodland, Philadelphia 4, Penna., 1945–1948; Rt. 8, Box 1059, Modesto, Calif., 1948–1950; Box No. PMB 8337, Danbury, Conn., 1951. My parents, Thompson V. Palmer and Esther L. Palmer, are both now living at R. No. 5, West Chester, Pa. They are both Quakers.

"I have never belonged to any military organization. I am a member of the Religious Society of Friends, belonging to both Philadelphia Yearly Meetings, at 1515 Cherry Street, Philadelphia 2, Pa., and 304 Arch Street, Philadelphia 6, Pa., respectively. My home meeting is Concord United Meeting, Concordville, Pa.; at present I am attending Oberlin Meeting, Sturges Hall, Oberlin, Ohio.

"The Society of Friends is one of the so-called 'historic peace churches.' The 'Advices on Conscription and War', issued by a Meeting representing Friends in the United States, held in 1948 at Richmond, Indiana, and since adopted by many Yearly Meetings and other Friends groups, say in part: 'Friends are exhorted to adhere faithfully to this testimony against all wars and fightings, and in no way to unite with any warlike measure such as a Selective Service Draft or Universal Military Training. * * * We warmly approve civil disobedience under Divine Compulsion as an honorable testimony in keeping with the history and practices of Friends.'

"I have been an active member of the Fellowship of Reconciliation, a religious pacifist organization, since about 1947. I have also been a member of the Boy Scouts of America, several Consumers Co-operatives, the Kirkridge Movement (an interdenominational movement of religious discipline and fellowship), and the Rural Life Association (a religious organization promoting rural life).

"The following persons might be able to give information regarding the consistency of my pacifist stand (none are related to me):

"J. Barnard Walton, 132 Park Ave., Swarthmore, Pa., Executive Secretary, Friends General Conference, (retired).

"Wendell B. Kramer, 1320 So. San Joaquin, Stockton, Calif., Methodist minister, former manager of Tuolumne Cooperative Farms, Inc.

"William K. McDermott, Supervisor of Classification and Parole, Federal Correctional Institution, Danbury, Conn.

"Leonard A. Stidley, Dean, The Graduate School of Theology, Oberlin College, Oberlin, Ohio.

"I am conscientiously opposed to participation in war in any form, and further am conscientiously opposed to any training or service in the armed forces or to any service in which I would be under the supervision and control of the Selective Service System.

"(Sgd.) T. Vail Palmer, Jr."